## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **BEHROOZ P. VIDA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 4:24-CV-297-P** |
| | § | |
| **DAVID KING, KINGCO** | § | |
| **INVESTMENTS, LLC, GEORGE L.** | § | |
| **DIAMOND, AND GRAY REED &** | § | |
| **MCGRAW LLP,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Behrooz P. Vida ("Plaintiff"), as Trustee for the Chapter 7 estates of the debtors Water Now, Inc. ("Water Now") and its subsidiary Hydraspin USA, Inc. ("Hydraspin"), files this First Amended Complaint against Defendants David King ("King"), KingCo Investments, LLC ("KingCo"), George L. Diamond ("Diamond"), and Gray Reed & McGraw LLP ("Gray Reed") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

On March 28, 2016, the United States Bankruptcy Court for the Northern District of Texas entered an Order Confirming First Amended Joint Plan of Reorganization in a bankruptcy involving a complex hospital system in North Texas. The court's plan was a major success for HFG Capital Investments, LLC ("HFG-CAP"). HFG-CAP preys on bankruptcy proceedings, picking off bankrupt entities and using them as "vehicles" for "reverse mergers." Under HFG-CAP's business model, bankrupt businesses are merged into small companies that lack the minimum requisite shareholders to become listed on an exchange. Through the merger, the small company acquires additional shareholders and becomes eligible for trading on an exchange—even

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                         **PAGE 1**

though it may be entirely unsuitable for the small company to be publicly traded. As part of the court's plan, HFG-CAP was obligated to merge the bankrupt entities into "viable, operating business enterprise[s]."

But in March 2016, George Diamond, one of the owners of HFG-CAP, needed to identify eleven small companies that wanted to become publicly traded in order to carry out the terms of the court's order. And he had limited time to do it. Surprisingly, within one week of the court's entry of the plan, HFG-CAP executed an Advisory Agreement with Water Now—a company that had been formed 8 weeks prior—to take the company public in exchange for $225,000 and 3% of Water Now's common stock. At the time they executed the Advisory Agreement, Water Now had no revenue, no assets, and no business that justified it becoming a publicly traded company.

George Diamond is also an attorney at Grey Reed. By the end of April 2016, Gray Reed entered into an engagement agreement to represent Water Now as outside counsel in connection with its efforts to become publicly traded. From that point forward, Diamond and Gray Reed advised Water Now in connection with the merger, its registration of securities, its day-to-day business affairs, and even litigation brought against the company and its CEO.

But as they purportedly advised Water Now, neither Diamond nor Gray Reed disclosed to the company that they also represented HFG-CAP, that HFG-CAP was motivated to comply with the bankruptcy court's order, that Diamond and Gray Reed had a decades-long relationship with HFG-CAP and its principals, that Diamond was one of the owners of HFG-CAP, and that Diamond and Gray Reed were heavily incentivized to place the interests of HFG-CAP above those of Water Now.

With the goal of satisfying their obligations to the bankruptcy court, Diamond and Gray Reed quickly set out to take the company public following a playbook they utilized many times

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **PAGE 2**

with other HFG-CAP clients—whether or not it was prudent or in the best interests of Water Now. To assist taking Water Now public, Diamond and HFG-CAP surrounded Water Now with unethical accountants, auditors, broker dealers, and other professional service providers because Diamond knew they would rubber stamp Water Now's activities and ignore questionable conduct. Virtually all of the service providers selected by Diamond were subsequently fined, sued, or otherwise censured by the SEC, PCAOB, or FINRA for illicit or illegal activity, including manipulation of audit records, failing to detect money laundering, and sponsoring unqualified companies for trading on the OTC markets.

While preparing to submit Water Now's FINRA Form 211, Diamond and Gray Reed created backdated documentation to support supposed gift share transfers by King to known associates of King as well as dozens of other people and entities. They then failed to advise Water Now of its rights to recover trading profits in connection with King's transactions. They also contributed to illegal transfers of Water Now stock in many ways, including by issuing defective Rule 144 opinion letters to improperly support the removal of share restrictions.

After facilitating the registration of Water Now's securities and priming the company for an eventual pump-and-dump market manipulation scam, Diamond and Gray Reed continued advising Water Now and Hydraspin while David King, the CEO, CFO and sole member of the Board of Directors for both entities, abused his powers and lined his pockets from the bank accounts of the companies he was trusted to oversee.

Rather than act in accordance with his fiduciary duties, King manipulated and abused Water Now and Hydraspin, including by borrowing significant amounts of money, often via KingCo's bank account, to then enrich himself, his friends, and his family. Diamond and Gray Reed, as the companies' trusted advisors, were aware that King was siphoning money from Water

Now and Hydraspin. Diamond and Gray Reed, however, failed to advise Water Now and Hydraspin of King's conduct and continued to facilitate his scheme.

While draining Water Now's resources and taking the company into significant debt, King failed to generate any meaningful revenue for the company. In fact, during the fiscal year ended December 31, 2016, the year of its inception, Water Now incurred $1,880,164 in operating expenses and had no net revenue whatsoever. In the fiscal year ended December 31, 2017, the company generated approximately $35,570 in net revenue while its operating expenses were $1,735,959. Water Now's financial health did not improve in 2018 or 2019, consistently earning six figures in revenue but incurring seven figures in operating expenses. Water Now's severe financial crisis was no secret to Diamond and Gray Reed. Nevertheless, Diamond and Gray Reed never advised Water Now and Hydraspin regarding King's conduct; neither did Diamond and Gray Reed take any measures to remedy the situation, as required under the Texas Disciplinary Rules. Notably, Diamond and Gray Reed continued as Water Now and Hydraspin's counsel for years, contributing to King's wrongdoings and receiving hundreds of thousands of dollars in payment as purported legal fees, but effectively as compensation for enabling King to pursue his illegal endeavors through Water Now and Hydraspin.

Unsurprisingly, Diamond and King never confronted or questioned King regarding the blatantly false press releases regarding Water Now's operations and revenue misrepresenting Water Now as a sound, rapidly growing, and successful business. In fact, Diamond and Gray Reed drafted and approved many false press releases, either without investigating the veracity of the information provided therein, or blatantly fabricating facts. These misrepresentations ultimately served King's personal interests and directly harmed Water Now and Hydraspin, allowing King to raise money through Water Now, which he then used to directly benefit himself. Instead of using

the money raised to generate sources of revenue or invest in assets for Water Now, King used the funds to pay high salaries and bonuses to himself and his family or, in many cases, simply stuff the money in his pockets. Diamond and Gray Reed were at all relevant times aware of King's acts but took no substantive action to safeguard Water Now and Hydraspin's interests.

King's abusive actions, while benefiting himself, his friends, and his family, were to the complete detriment and disregard of Water Now and Hydraspin's best interests. Their legal counsel, Diamond and Gray Reed, besides negligently failing to properly advise Water Now and Hydraspin of the consequences of King's acts, breached their own duties to the companies, and actively participated in King's breaches of fiduciary duties towards them. As a result, Plaintiff brings this action against King, KingCo, Diamond, and Gray Reed and seeks all recoverable, compensable, and punitive damages caused by: (i) King's breach of fiduciary duties through his gross mismanagement, self-dealing, corporate waste, unjust enrichment, and short-swing trading; (ii) Diamond and Greed Reed's legal malpractice and breach of fiduciary duties owed to Water Now and Hydraspin; and (iii) KingCo, Diamond and Gray Reed's knowing participation in King's breaches. Additionally, Plaintiff seeks to void and recover all fraudulent transfers that King made to himself, KingCo, Gray Reed, and Diamond, while using Water Now and Hydraspin as vessels for his own corruption.

## PARTIES

1.      Plaintiff, Behrooz P. Vida, is the Trustee for the Chapter 7 estate of Water Now and Hydraspin.

2.      Water Now is a Texas Corporation with its principal place of business in Fort Worth, Texas, during the time of its operations relevant to this action.

3.      Hydraspin is a Texas Corporation with its principal place of business in Fort Worth, Texas, during the time of its operations relevant to this action. Hydraspin is a subsidiary of Water Now.

4.      King is an individual who resides in Mansfield, Texas. King has already appeared in this action and may be served through his counsel of record.

5.      KingCo is a Texas limited liability company with its principal place of business in Mansfield, Texas. KingCo has already appeared in this action and may be served through its counsel of record.

6.      George L. Diamond is an individual who resides in Dallas, Texas. Diamond may be served at 4622 Gilbert Ave, Dallas, TX 75219-1607, or wherever he may be found.

7.      Gray Reed & McGraw LLP is a Texas limited liability partnership with its principal place of business in Dallas, Texas. Gray Reed may be served through any general partner, including Darrell Armer, at its office located at 1601 Elm Street, Suite 4600, Dallas, TX 75201.

## JURISDICTION AND VENUE

8.      On March 8, 2023, Water Now and Hydraspin filed their voluntary petitions under Title 11, Chapter 7 of the United States Code ("Bankruptcy Code"), whereby the Office of the United States Trustee appointed Laurie D. Rea as Trustee. Laurie D. Rea resigned on March 12, 2024 due to conflict and was substituted by Behrooz P. Vida. Non-individual Chapter 7 Voluntary Pet., *In re Water Now*, No. 23−40678−mxm7 (Bankr. N.D. Tex. Mar. 8, 2023), EFC No. 1; Non-individual Chapter 7 Voluntary Pet., *In re Hydraspin*, No. 23−40677−elm7 (Bankr. N.D. Tex. Mar. 8, 2023), EFC No. 1.

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1334 as it arises under the Bankruptcy Code. 28 U.S.C. § 1334(a)-(b). Further, this Court has

personal jurisdiction over the Defendants because King and Diamond are domiciled in the state of Texas. KingCo and Gray Reed's principal places of business are also located in the state of Texas.

10.     Venue in the Northern District of Texas is proper under 28 U.S.C. § 1408 and 1409 because this proceeding arises under, arises in, and is related to the cases commenced under the Bankruptcy Code originally filed in the United States Bankruptcy Court for the Northern District of Texas, Cases Nos. 23-40678-mxm-7 and 23-40677-elm-7, on March 8, 2023. Moreover, prior to and at the time of their collapse, Water Now and Hydraspin had their principal place of business in Fort Worth, Texas, and the tortious conduct giving rise to this suit took place substantially in this judicial district.

## FACTUAL BACKGROUND

11.     Water Now was incorporated on February 10, 2016, for the purpose of developing and commercializing a patent-pending, gas/diesel-powered, portable device that processes and purifies contaminated water. From Water Now's inception until King's resignation on April 1, 2022, King served as Water Now's CEO, CFO, and the sole member of its Board of Directors.

12.     In October 2018, under King's direction and control, Water Now formed Hydraspin as its wholly-owned subsidiary. Hydraspin allegedly engaged in the installation and operation of oil recovery machines deployed at saltwater disposal wells utilizing technology developed by African Horizon Technologies (Pty) Ltd ("AHT").

13.     KingCo was created by King on May 24, 2019. The purpose of KingCo, as stated in its Company Agreement, is to buy, sell, and manage real estate. King, at all relevant times, was the Managing Member of Defendant KingCo.

14.     Gray Reed and its of-counsel, Diamond, were Water Now and Hydraspin's counsel while under King's control. Diamond is also a member and manager/director of HFG Capital

Investments, LLC, the company that promoted Water Now's merger with VCAB One Corporation ("VCAB"), created by the conversion of Victory Medical Center Mid-Cities, LP, a Chapter 11 Bankruptcy debtor, into a corporation under the HFG-CAP Supplement to the Victory Medical Chapter 11 Plan, as hereinafter defined.

15.     King served as CEO, CFO, and the sole member of Water Now's Board of Directors, as well as the CEO, Treasurer, and sole member of the Board of Directors for Hydraspin. In other words, during the relevant timeframe, King had complete control over Water Now and Hydraspin.

16.     In his position of complete control, King routinely used KingCo's bank accounts to purportedly loan money to, and receive repayments from, Water Now and Hydraspin. Water Now and Hydraspin were innocent victims of Defendants' tortious acts. As distinct and separate entities from King and any other agents, Water Now and Hydraspin were not aware that King, along with Diamond and Gray Reed were using them to commit wrongdoings. Accordingly, but for the tortious acts of King in abuse of his leadership position, with the assistance, aid, and abetment from Diamond and Gray Reed, Water Now and Hydraspin would not have engaged in any such conduct.

17.     In addition to his roles with Water Now and Hydraspin, King served as CEO, Director, and Manager of Robust Energy, LLC, a Texas limited liability company, along with Steve F. Clohessy, who was also a shareholder of Water Now. Another shareholder and employee of Water Now, Kim Vaughn, was an administrative officer of King's Robust Energy, LLC.

18.     King also owns and operates a marijuana business in Hugo, Oklahoma. King is the registered agent for The Flower Crushers LLC, an Oklahoma marijuana dispensary. Eric Neil, a former employee and shareholder of Water Now, is the registered agent for Factory Direct Flower

Crushers LLC and Bird Dog Holdings LLC, Oklahoma limited liability companies. Bird Dog Holdings, LLC is the holder of the King's business' Cannabis Processor license.

19.     Upon information and belief, JPMorgan Chase Bank—Water Now and Hydraspin's financial institution—terminated its banking relationship with Water Now and Hydraspin because King was depositing substantial cash receipts from the sale of marijuana into Water Now's bank accounts (i.e., money laundering).

## I.   Diamond and Gray Reed Fail to Disclose Multiple Conflicts of Interest While Advising Water Now.

20.     Water Now was incorporated on February 10, 2016. Only two days later, on February 12, 2016, the Debtors in the Chapter 11 Bankruptcy Case *In Re Victory Medical Center Mid-Cities, LP et al* ("Victory Medical Debtors") proposed their First Amended Joint Chapter 11 Plan ("Victory Medical Chapter 11 Plan" or "Plan") that would soon lead to the merger of Water Now and VCAB.

21.     The amended Plan included the HFG-CAP Supplement, under which all assets of each Victory Medical Debtor would be transferred to a trust in order to create a new corporate entity so that each new corporate Victory Medical Debtor would be utilized, per the requirements and restrictions set forth in the HFG-CAP Supplement, as a merger, combination or acquisition vehicle for an allegedly <u>viable, operating entity</u> such that the operating entity would then have the minimum number of shareholders necessary to be listed on a stock exchange. *See* Chapter 11 plan, *In re Victory Medical Center Mid-Cities, LP et al.*, No. 15-42373-rfn-11, (Bankr. N.D. Tex. Feb. 12, 2016), EFC No. 776. The Victory Medical Chapter 11 Plan was approved by the bankruptcy court on March 28, 2016. *See* Order confirming chapter 11 plan, *In re Victory Medical Center Mid-Cities*, LP et al., No. 15-42373-rfn-11, (Bankr. N.D. Tex. Mar. 28, 2016), EFC No. 969.

22.     HFG-CAP is a company that enables other companies to go public when they are otherwise unsuitable to be publicly traded entities. Among other things, HFG-CAP targets entities subject to Chapter 11 bankruptcy, becomes part of the entity's Chapter 11 Plan, and then facilitates the merger of the bankrupt entity with privately held companies. The bankrupt entity's creditors then become shareholders in the privately held company, which allows the company to meet the requisite minimum shareholder requirement to be listed on an exchange once it is registered with the U.S. Securities and Exchange Commission ("SEC").

### A.     Diamond and Gray Reed Fail to Disclose Gray Reed's Relationship with HFG-CAP and the Details of the Bankruptcy Plan.

23.     Diamond, Water Now's former counsel through Gray Reed, was—and still is—a member and manager/director of HFG-CAP. Diamond was appointed under the Victory Medical Chapter 11 Plan as the agent authorized to convert the Victory Medical Debtors into corporations, and to direct and control each such corporation pursuant to the HFG-CAP Supplement.

24.     Diamond was highly incentivized to find merger targets for the eleven VCAB entities. With each merger, Diamond and his partner at HFG-CAP would receive a cash fee of approximately $200,000 to $300,000 plus equity in the operating entity. But, more concerning, Diamond was under court order to complete the VCAB mergers within a specific timeframe.

25.     Days after the Plan was approved by the bankruptcy court, and on April 4, 2016— less than eight weeks after the company was formed—Water Now entered into an Advisory Agreement with HFG-CAP to assist Water Now in a "going public transaction," through the same process described in the HFG-CAP Supplement to the Victory Medical Chapter 11 Plan ("Advisory Agreement"). On or about April 27, 2016, Water Now retained Gray Reed to prepare Water Now's Form 10 for registration of securities. Despite the limited initial scope of their

engagement, Diamond and Gray Reed quickly began performing all outside counsel functions for Water Now and Hydraspin.

26.     On information and belief, neither Diamond nor Gray Reed disclosed to Water Now that Gray Reed was also representing HFG-CAP during the VCAB merger. On information and belief, neither Diamond nor Gray Reed disclosed to Water Now that Gray Reed had a longstanding client relationship with HFG-CAP prior to representing Water Now.

27.     On information and belief, neither Diamond nor Gray Reed disclosed to Water Now that Diamond and HFG-CAP were under court order to find eleven merger targets within an accelerated timeframe when they advised Water Now in connection with the merger and subsequent registration of its securities.

28.     On information and belief, neither Gray Reed nor Diamond disclosed any conflicts of interest to Water Now in connection with the VCAB merger or subsequent registration of Water Now's securities.

29.     On September 27, 2016, Water Now entered into a transaction, orchestrated and facilitated by Gray Reed and Diamond via a Merger Agreement, whereby VCAB merged with and into Water Now ("Merger"). VCAB had minimal assets, no equity owners, and no liabilities except for approximately 1,500 holders of claims against it (collectively, "Claim Holders"). The Merger resulted in Water Now issuing, according to its Form 10, 900,000 freely tradeable shares of common stock ("Plan Shares"). 630,006 shares were issued to HFG-CAP, 73,802 to the Claim Holders as full settlement and satisfaction of their respective claims, and 196,192 were held as reserve.

30.     As a result of the Merger, Water Now recorded on its Form 10 for the registration of securities with the SEC total restructuring expenses of $615,000, including $165,000 in

consulting fees and $450,000 for the issuance of the Plan Shares for settlement of claims held by the Claim Holders. Water Now paid HFG-CAP, Diamond's company, $225,000 to arrange the Merger and provide additional assistance relating to listing Water Now's common stock on the NASDAQ or NYSE/AMEX stock exchanges. Water Now stock, however, was never listed on a national securities exchange.

31.     The explicit purpose of the HFG-CAP Supplement was to use Victory Medical Debtors to serve "as a merger, combination or acquisition vehicle[s] for an operating, solvent entity." Nevertheless, according to Water Now's Form 10, which Gray Reed prepared, Water Now could hardly be considered an operating or solvent entity at the time of the Merger. Water Now did not generate *any* revenue until June 30, 2017. In fact, during the fiscal year ended December 31, 2016, Water Now's operating expenses were $1,880,164. In the fiscal year ended December 31, 2016, Water Now had $336 in liquid assets. Water Now's significant operating losses and lack of sufficient cash made it necessary for its auditors to issue a going concern opinion ("GCO"), a report issued by an auditor when they have substantial doubts about a company's ability to continue operating, with respect not only to Water Now's financial statements generated in 2016, but in every single other year of its existence under King's control.

32.     Water Now also reported in its Form 10 that it had "limited operations," a statement in direct contradiction to the purpose of the HFG-CAP Supplement that Water Now be an "operating" entity. In fact, prior to the Merger, Water Now had not even issued shares of stock of any nature whatsoever. After the Merger and at the time it filed its Form 10, Water Now had roughly 690 shareholders, around 600 of them being previous Claim Holders. Accordingly, Water Now was neither operating nor solvent, and Diamond, HFG-CAP's representative, did not follow

the provisions on the HFG-CAP Supplement as approved by the U.S. Bankruptcy Court for the Northern District of Texas when it used Water Now as a merger partner.

33.     The timeline of Water Now's formation and the resulting Merger reveal the true purpose of Diamond and Gray Reed's role in taking Water Now public:

- On February 10, 2016, Water Now was incorporated.

- On February 12, 2016, two days later, the Victory Medical Debtors approved the Victory Medical Chapter 11 Plan containing Diamond's HFG-CAP Supplement.

- On March 28, 2016, the Victory Medical Chapter 11 Plan was approved by the bankruptcy court.

- On April 4, 2016, less than two months after its formation, Water Now entered into an Advisory Agreement with Diamond's HFG-CAP to transition Water Now into a public entity.

- On April 27, 2016, Water Now retained Diamond and Gray Reed to prepare Water Now's Form 10 for registration of securities with the SEC.

- On September 23, 2016, Gray Reed and Diamond created, via conversion, VCAB, one of the Victory Medical Debtor corporate entities.

- On September 27, 2016, HFG-CAP caused VCAB to merge into Water Now, also facilitated by Diamond and Gray Reed, who represented both parties simultaneously.

34.     As shown above, in approximately seven months, Water Now was incorporated and merged with VCAB as facilitated by Diamond, HFG-CAP's owner, through Gray Reed. Gray Reed had been engaged as Water Now counsel to file its registration statement with the SEC pursuant to the HFG-CAP Supplement under the terms of the Merger Agreement that Gray Reed and Diamond themselves prepared. Unbeknownst to Water Now, Diamond and Gray Reed set up the Merger for their own benefit and the benefit of their client—HFG-CAP—and to the detriment of Water Now.

35.     Diamond and Gray Reed failed to adequately advise Water Now in connection with the Merger and the registration of its securities with the SEC. A prudent attorney not blinded by

conflicts of interest would have advised against the Merger or going public because, among many reasons, Water Now did not have any viable products or services and it did not have the resources to go public or maintain itself as a publicly traded entity.

36.     For his role in the HFG-CAP merger, Diamond, through Colhurst Capital, L.P., another of his entities, received 215,460 shares of Water Now common stock, which, on information and belief, he later sold to the public when the stock was eventually listed on an exchange.

37.     Despite retaining Diamond and Gray Reed to prepare the registration in September 2016, Water Now would ultimately not have its securities registered until October 10, 2017. It took King, Gray Reed and Diamond nearly a year after the Merger to craft a narrative portraying Water Now as a "registrable" corporation—because it wasn't. Diamond and Gray Reed failed to adequately advise Water Now of this fact and blindly pressed forward with their plans to take it public because doing so would boost the reputation of their client, HFG-CAP, and create a market for the securities Diamond received as a result of the Merger, which he could then sell to the public for a profit. Water Now was approved for uplisting on OTC Markets Group Inc. ("OTC Markets") exchange only on February 11, 2019, more than two years after the Merger.

**B.     Diamond and Gray Reed Fail to Disclose Their Deep Relationship With HFG-CAP and the Halter Family and Known Deficiencies in their "Reverse Merger" Strategy.**

38.     HFG-CAP is a successor of the Halter Financial Group, L.P. ("HFG"). Timothy P. Halter ("Tim Halter"), Halter Jr.'s brother, is an officer, director and shareholder of HFG. Gray Reed's relationship with the Halter family and their businesses goes back decades. For example, in 1995, HFG acquired control over Karts International Incorporated ("Karts"), a Nevada corporation, to utilize it as a suitable entity for a possible merger or acquisition of a company that offered growth potential in a manufacturing industry. HFG then caused Karts to acquire Brister's

Thunder Karts, Inc., a Louisiana corporation. On August 19, 1997, Karts filed an Amendment to its Form SB-2 with the SEC for the offering of its securities. The opinion letters regarding the legality of the securities being offered were issued by Looper, Reed, Mark & McGraw Incorporated, currently Gray Reed, and signed by its then member, Richard B. Goodner, Esq.[1] ("Goodner"). Goodner was part of the HFG-CAP team when it engaged with Water Now and assisted Diamond and Gray Reed in, for example, the conversion of Victory Medical Center Mid-Cities, LP into VCAB. On October 12, 2016, HFG-CAP transferred 50,400 shares of Water Now common stock to Goodner for his efforts. As of October 30, 2017, Goodner was among the shareholders of Water Now holding a relevant amount of common stock and retaining voting rights.

39.     As another example of the relationship between Diamond, Gray Reed and HFG-CAP, in 2010, Halter Financial Investments L.P. ("HFI") was the principal shareholder of BTHC XV, Inc. ("BTHC"), a Delaware corporation, which merged into Long Fortune Valley Tourism International Limited ("Long Fortune"), a Cayman Islands company. Not long after this merger, the financial consultant Greentree Financial Group, Inc. ("Greentree") sued Long Fortune and BTHC for breach of contract and HFI for tortious interference with the business relationship between Greentree and Long Fortune. Among other law firms, Looper Reed & McGraw, P.C., currently Gray Reed, defended Long Fortune, BTHC, and HFI.

40.     HFG-CAP, as successor of HFG, claims having facilitated similar mergers to list companies on U.S. exchanges, also known as "reverse mergers," for more than seventy organizations since 1995. In fact, Tim Halter became "famous" in the 2000s for such "back-door listings" whereby privately held companies become public without filing a prospectus or

---

[1] Mr. Goodner passed in or about October 2020.

undergoing an Initial Public Offering ("IPO"), notably involving Chinese businesses, like Long Fortune.[2] HFG called this reverse merger strategy "APO," or "Alternative Public Offering," and registered it as a trademark with the United States Patent and Trademarks Office (USPTO).

41.     Reverse mergers like APOs present several potential problems and risks, including reduced regulatory scrutiny compared to traditional IPOs, potentially allowing fraudulent or poorly disclosed companies into public markets. Investors may struggle with due diligence due to limited transparency, leading to concerns about financial stability. Illiquid stocks, lower listing standards, weaker governance, negative perceptions, volatility, and legal compliance risks further characterize the drawbacks of reverse mergers. On information and belief, many companies that worked with HFG and affiliated entities struggled with such issues after their APO, including China Automotive Systems ("CAAS"), to which the Public Company Accounting Oversight Board (PCAOB) issued a report in 2007 faulting one of CAAS's auditor, Schwartz Levitsky Feldman, for deficiencies of such significance in the PCAOB's inspection of CAAS that it appeared to the inspection team that the firm did not obtain sufficient competent evidential matter to support its opinion on CAAS' financial statements. On information and belief, the PCAOB reported the same problems in a new inspection in 2010.

42.     Tim Halter is also a director of DXP Enterprises, Inc., a Texas corporation in the business of distributing maintenance, repair and operating (MRO) products, equipment and service to industrial customers. DXP lists Gary Messersmith, Esq. ("Messersmith") as a Senior Vice President and General Counsel. Messersmith practiced law for more than 38 years with Gray Reed. Gray Reed has provided legal services to DXP in various areas for many years.

---

[2] Melanie Lee, *How a Chinese cave got listed on the U.S. stock market* (Nov. 30, 2011, 10:03 AM CST), https://www.reuters.com/article/idUSTRE7AT17M/.

43. Finally, Diamond and David R. Earhart ("Earhart"), a partner at Gray Reed, are part of the Board of Advisors of Ancorp Capital Group, Inc. ("Ancorp"), a Florida corporation that provides advisory services, including those related to HFG's trademarked APOs. The Halter Financial Group, which includes HFG-CAP, is Ancorp's partner. Unsurprisingly, Gray Reed is part of the Ancorp and HFG Group, providing legal services to them both. Earhart, through Gray Reed and along with Diamond, assisted Water Now in many legal matters, including the issuance of several Rule 144 Letters for the sale of Water Now's restricted common stock.

44. Due to the long and regular relationship among Gray Reed, the Halter family and businesses, and Diamond, Defendants Gray Reed and Diamond, knew, or, at a minimum, should have known of the Halter family and the Halter Financial Group's history, as well as the troubles involving reverse mergers, such as HFG's APO, of which Water Now was an innocent victim. Diamond and Gray Reed, however, failed to advise Water Now about such potential risks and pushed forward with the proposed Merger.

## II.    Diamond and Gray Reed Advise Water Now to Retain Unethical Professional Service Providers to Enable it to Qualify for Registration and Listing on a Public Exchange.

45. Soon after Water Now engaged Gray Reed and Diamond, and on information and belief, Diamond and/or Gray Reed began recommending various professional service providers to Water Now that would be necessary for Water Now to become a publicly traded entity.

46. On information and belief, Diamond and/or Water Now knew or should have known that these professional service providers were unethical and had engaged in prior unlawful or unethical conduct that enabled companies to appear to meet the requirements to be publicly traded when they were otherwise unsuitable to be publicly traded.

47. On information and belief, Diamond and/or Water Now recommended many of the same professional service providers to other companies that utilized HFG-CAP's "reverse merger"

services because they were known to turn a blind eye to deficiencies that would otherwise interfere with their objective of taking a company public that was otherwise unsuitable for being publicly traded.

48.     These unethical service providers also enabled King to breach his fiduciary duties and take advantage of Water Now and Hydraspin for his own personal benefit, removing cash from the business through fictitious loans, false expense reports, unjustified wages, and other means, creating and increasing the companies' debt, affecting the business' valuation, and, ultimately, causing Water Now and Hydraspin's bankruptcy.

49.     Had Diamond and Gray Reed advised Water Now and Hydraspin to retain qualified service providers, they would have identified King's wrongdoings, King would not have been able to commit them, and the companies would not have suffered damages.

**A.     Diamond and Gray Reed Encourage Water Now to Retain a Securities Transfer Agent Founded by Diamond's Partner and Previously Censured by the SEC.**

50.     At all relevant times, Diamond has practiced law at Gray Reed while also serving as a member, manager/director, principal and general counsel of HFG-CAP. HFG-CAP was founded by Kevin Halter, Jr. ("Halter Jr."), its president. Halter Jr. also founded and operated Securities Transfer Corporation ("STC") until at least its sale in 2016. As stated above, HFG-CAP is a successor of the Halter Financial Group, L.P.. As stated above, Tim Halter, Halter Jr.'s brother, is an officer, director and shareholder of HFG.

51.     Under the Advisory Agreement crafted by Diamond, HFG-CAP committed to engaging STC on behalf of Water Now as its securities transfer agent and registrar. STC remained Water Now's transfer agent at all relevant times in this lawsuit.

52.     Transfer agents record changes of ownership, maintain the issuer's security holder records, cancel and issue certificates, and distribute dividends for issuing companies. SEC rules

and regulations are intended to facilitate the prompt and accurate clearance and settlement of securities transactions and to assure the safeguarding of securities and funds.

53.     On March 3, 2011, the SEC issued an order instituting proceedings against Halter, Jr. and STC alleging, among other things, that Halter Jr., as president and principal of STC, failed to adopt and implement procedures to prevent the misappropriation of funds from STC and its clients, thereby violating Securities laws.[3] According to the SEC proceedings, between August 2007 and November 2008, STC's then bookkeeper, Kevin B. Halter ("Halter"), Halter Jr.'s father, misappropriated approximately $2.7 million from ten issuer accounts. The transfers were identified during a routine examination of STC by SEC staff and resulted in Halter's termination.

54.     The SEC ordered that STC and Halter Jr. cease and desist from committing or causing any future violations of such laws, STC was censured and ordered to pay a civil money penalty, and Halter Jr. was suspended from association in a supervisory capacity with any transfer agent, broker, dealer, investment adviser, municipal securities dealer, municipal advisor, or nationally recognized statistical ratings organization for a period of three months.

55.     On information and belief, Halter Jr. continued exercising influence over STC after its sale in 2016.

56.     Diamond and Gray Reed knew or should have known of the history of securities violations involving HFG-CAP's President, Halter Jr., and STC and should have advised Water Now to retain a transfer agent that was not affiliated with Diamond's business partner and that did not have a history of securities violations.

---

[3] *In the Matter of Sec. Transfer Corp. & Kevin Halter, Jr. Respondents.*, Release No. 64030 (S.E.C. Release No. Mar. 3, 2011).

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                                    **PAGE 19**

57.     Additionally, Diamond and Gray Reed failed to conduct appropriate oversight of STC's activities involving wrongful transfers of Water Now shares of common stock, which manipulated the market's perception of Water Now's stock value to serve King's interests and to the detriment of Water Now, and exposed the company to liability.

**B.    Diamond and Gray Reed Encourage Water Now to Retain an Audit Firm whose Founding Partner was Subsequently Disciplined for Altering Audit Documentation.**

58.     Diamond and/or Gray Reed also encouraged Water Now to retain Turner Stone & Company, LLP ("Tuner Stone"), which, since Water Now's inception, and until, at least, 2021, provided accounting and auditing services to Water Now and Hydraspin.

59.     Turner Stone has a history of past and present issues with the Public Company Accounting Oversight Board ("PCAOB"), which has instituted multiple disciplinary proceedings and imposed sanctions against it. Unsurprisingly, last year the PCAOB sanctioned Edward Turner, CPA ("Turner"), a founding partner of Turner Stone, for providing improperly altered audit documentation and other misleading information to PCAOB inspectors. Specifically, after Turner learned the PCAOB would inspect Turner Stone's audit and review, he improperly prepared and added a new work paper to the audit documentation, backdated his sign-off and the engagement quality reviewer's sign-off on the new work paper, and deleted a work paper from the audit documentation. Turner then provided the audit file to PCAOB inspectors without disclosing that it had been altered. When PCAOB inspectors asked about the new work paper, Turner acknowledged his conduct only in part and provided additional misleading information. In addition to censuring Turner and imposing a $50,000 civil money penalty on him, the order permanently barred Turner from being associated with a registered public accounting firm. *In the Matter of Edward Turner, CPA*, PCAOB Release No. 105-2023-009 (Pub. Co. Acct. Oversight Bd. July 18, 2023).

C.   **Diamond and Gray Reed Encourage Water Now to Retain a Financial Services Firm that was Subsequently Sanctioned by the SEC for its Role in Creating Sham, Blank-Check Companies.**

60.   As part of its going-public transaction, Water Now needed a financial advisor to file a Form 211 Application with the Financial Industry Regulatory Authority (FINRA) to allow Water Now's stock to be eligible for trading on the OTC Marketplace. Diamond and/or Gray Reed encouraged Water Now to retain Spartan Securities Group, Ltd. ("Spartan"), which worked alongside Diamond and Gray Reed on Water Now's FINRA 211 Application. Diamond and Gray Reed prepared this application with minimal due diligence and based on vague or non-existent share transaction records for Water Now, including numerous purported Gift Letters transferring King's shares to his family and friends. Notably, these Gift Letters were not executed at the time of the actual stock transfers, but instead were drafted with the help of Diamond and Gray Reed, back-dated, and signed by King solely because they were required for Water Now's FINRA 211 Application, pursuant to FINRA's regulations.

61.   Spartan also had prior legal troubles, similar to Water Now's other service providers. In 2019, the SEC charged Spartan and its transfer agent for helping create and sell at least nineteen purportedly legitimate public companies that were in fact shams from 2009 to 2014. According to the SEC's Complaint, Spartan filed fraudulent applications with FINRA to publicly list the companies' common stock and ultimately enable the shares to become free-trading and available to public investors. The SEC's Complaint also alleged that Spartan's principals, Carl E. Dilley ("Dilley") and Micah J. Eldred ("Elred"), signed the fraudulent applications even though they knew or should have known that the companies were fake, and that David D. Lopez, Spartan's managing partner, failed to investigate red flags raised by FINRA or even familiarize himself with the companies. David D. Lopez was directly involved in the preparation of Water Now's FINRA Form 211 Application.

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **PAGE 21**

62.     On August 10, 2022, Spartan, Dilley, Elred, and Spartan's transfer agent were ordered to pay nearly $1 million in monetary remedies, and Spartan, Dilley and Eldred were barred from participating in the issuance, trading, offer or sale of penny stocks.

**D.      Diamond and Gray Reed Encourage Water Now to Retain a Broker Dealer that was Subsequently Sued by the SEC for Failing to Report Suspicious Activity.**

63.     Diamond and/or Gray Reed also encouraged Water Now to retain JH Darbie & Co., Inc. ("JH Darbie") to introduce Water Now to third-party investors. Similar to other Water Now service providers, on September 13, 2023, the SEC obtained a judgment against JH Darbie in connection with the firm's failure to report suspicious money laundering activity, from at least January 2018 to January 2020, related to transactions in tens of billions of shares of penny stocks that were traded in over-the-counter markets.

64.     Surrounding Water Now with unethical service providers was necessary to effectuate Diamond and Gray Reed's plan of taking Water Now public. Diamond and Gray Reed needed to employ unethical service providers to assist Water Now in the process of going public because the company was not otherwise suitable to go public, and to enable Diamond and Gray Reed effectively place their interests and the interests of their client, HFG-CAP, above those of Water Now.

65.     For example, Diamond and Gray Reed could have advised Water Now to retain different service providers, or, at a minimum, to implement stronger internal controls and oversight mechanisms to monitor transactions involving them, which Diamond and Gray Reed failed to do.

66.     Diamond and Gray Reed knew or should have known of the service providers' violation of securities laws and regulations and should have acted in a reasonably prudent manner by advising Water Now to engage ethical service providers. On information and belief, Diamond

and Gray Reed were familiar with the service providers unethical practice because they worked with them in connection with other HFG-CAP clients.

67.     Additionally, Diamond and Gray Reed had a duty to disclose their conflicting interests in connection with the merger transaction, including Diamond's financial relationships with the Halter Family and Halter companies, but Diamond and Gray Reed likewise failed to do so.

68.     Diamond and Gray Reed's conduct in surrounding the company with service providers that would ignore warning signs of fraud or misconduct also allowed King to take advantage of the company for his own personal benefit.

**III.    King Takes Advantage of the Crooked System Created by Diamond and Gray Reed.**

69.     Once the VCAB merger was complete and Water Now became publicly traded, Diamond and Gray Reed still had a client that was largely the product of their own machination. But the same unethical service providers that were necessary to enable it to become publicly traded soon enabled King to take advantage of the companies for his own benefit. And neither Diamond nor Gray Reed did anything relevant to protect the companies.

70.     Soon after taking the company public, King began using Water Now as a tool for borrowing money and enriching himself, his friends, and his family. John and Paul King, King's brothers, and Joshua King, King's son, were employees and shareholders of Water Now. Melissa King, King's wife, and Douglas E. Kramer, King's father-in-law, also owned Water Now common stock. Generally, Water Now's payroll was comprised of King's family members and friends. As Water Now barely had any operations, King's protegees were being paid salaries without providing any meaningful services in exchange.

71.     Through the Merger promoted by Diamond and Gray Reed, King effectively created an illusion of success to give Water Now the appearance of a legitimate business, which

attracted investors. Additionally, transforming Water Now into a publicly traded company, with the assistance of Diamond and Gray Reed, allowed King to manipulate Water Now's microcap stock to engage in unlawful activities.

72.     According to Water Now's 2017 Form 10-K, approved by Diamond and Gray Reed, Water Now entered into the Merger with VCAB with the sole purported intent to increase its shareholder base to satisfy the listing standards of a national securities exchange. Nevertheless, Water Now was never listed on any national securities exchange. Instead, on February 11, 2019, Water Now was listed in the OTCQB Venture Marketplace, an exchange designed for over-the-counter securities that do not qualify for listing on other stock exchanges such as the NYSE (New York Stock Exchange).

73.     According to Water Now's Form 10-Ks, Water Now was insolvent during most of its existence (despite the Victory Medical Bankruptcy Plan requiring Water Now to be operating and solvent). Water Now's total assets in the fiscal year ended December 31, 2016, the year of its incorporation, were $336, while its total liabilities were of $203,500. During the fiscal year ended December 31, 2018, Water Now had total assets of $1,921,268 and $2,799,309 in liabilities.

74.     Water Now's financial position became even worse in the fiscal year of 2019. While Water Now's assets totaled $4,415,106, its total liabilities were a staggering $11,037,487.

75.     Water Now's dire financial performance from its inception to its demise is a result of, among other factors exposed herein, Water Now's failure to maintain meaningful business operations under King's direction, and Diamond and Gray Reed's negligent and tortious professional services. Rather than becoming the legitimate business it had the potential to be, Water Now was, in reality, transformed by King, with the assistance of Diamond and Gray Reed,

into an elaborate front used solely for King's personal benefit and Diamond and Gray Reed's enrichment via attorney's and consulting fees, as well as cash and securities.

76.     King, assisted by Diamond and Gray Reed, sold Water Now's investors a promising tale of water purification and oil separation technologies, but this was all a ruse to entice investors to hand over their money to Water Now for King to misuse. As explained in more detail below, instead of developing Water Now into the promising business, King used Water Now's investors' money to subsidize his lifestyle, funnel cash to his friends and family through their excessive salaries, pay unethical service providers, including Diamond and Gray Reed, and siphon money for his own personal benefit through expense reimbursements and loans allegedly made to Water Now, some of which were made via KingCo's bank account. Meanwhile, Diamond and Gray Reed prepared, reviewed and approved all legal documents King used to perform all his wrongdoings and victimize Water Now and Hydraspin.

77.     Additionally, all actions taken by King and KingCo towards Water Now directly affected or included Hydraspin. In summary, King treated Water Now and Hydraspin as his own personal bank accounts while operating the companies' businesses for his own self-interest, all with the help and blessing of Diamond and Gray Reed.

**IV.    King's Improper Conduct Aided and Abetted by Diamond and Gray Reed.**

    **A.    King Gives Away Half His Shares of Water Now Stock to Friends and Family.**

78.     According to the Transaction Journals maintained by STC, Water Now's former transfer agent, Water Now issued 19,815,500 shares of common stock to King throughout 2016 and 2017.

79.     Water Now's own accounting records reflect that King gifted 12,356,500 of his 19,815,500 shares to third parties, most of whom were King's family members, friends, and Water Now "employees" (largely comprised of King's family and friends). Of the approximately 12

million purported gift shares, King gifted 4,301,500 shares to seemingly unaffiliated third parties. Oddly, at least 1,770,500 gift shares were transferred for an acquisition price of $0.50 per share. King also benefited from his shares of Water Now common stock by transferring at least 4,588,850 shares to third parties and grossing, on information and belief, $6,119.425 based on the acquisition prices per share reported by STC. King disposed of the shares issued by Water Now for his own personal gains and in blatant disregard for the best interests of Water Now. As an example of King's obvious self-serving practices, Water Now's accounting records show that, in 2017, King gifted 850,000 shares to Robert K. Bryant, Ronald G. Bryant, and Bob J. Bryant and Judith Bryant, who served as Co-Trustees of the Bob and Judith Bryant Revocable Trust ("Bryant Trust"). In an apparent underhanded trade-off, King personally borrowed at least $1,375,000 in construction loans from the Bryant Trust the very same year. All this happened behind Water Now's back, involving shares owned by King personally. Diamond and Gray Reed were well aware of these transactions, as Water Now's Form 211 FINRA Application required disclosure of all records of King's disposition of the company's stock.

80.    On information and belief, King gifted his shares to various persons affiliated with him in order to, among other things, control and manipulate the stock market in his favor and to avoid the regulations prohibiting the sale of unregistered securities by purportedly gifting shares in exchange for cash or other consideration "under the table."

81.    In or around August 2018, Diamond, Halter, and Goodner were assisting Water Now in preparing for a supposed private offering with Digital Mosaic Capital ("2018 Offering"). The offering went live on or around August 23, 2018, although no Regulation D Form for sale of securities in a private offering was ever filed with the SEC. Diamond and Gray Reed generally failed to cause the filing of many SEC-required documents on behalf of Water Now, including

numerous Form 4 Statements of Changes in Beneficial Ownership of Securities, thereby largely exposing the company to liability.

82.     In the month preceding the 2018 Offering, shareholders with a close relationship to King, including recipients of shares gifted by him, who likely possessed information regarding Water Now not available to the public, started moving shares among their own accounts. Shortly thereafter, many shareholders transferred their shares to Cede & Co. "Cede and Co." is the name under which shares held by The Depository Trust Company ("DTC") are registered. DTC is a company that provides book-entry and depository services and operates as a settlement system for public transfers of securities. Typically, Cede and Co. is the "legal owner" both before and after the transaction, which, notably, obfuscates the transaction and creates opportunities for bad actors commit fraud. Interestingly, although Water Now shareholders transferred their shares to DTC via Cede & Co. in or around July 2018, Water Now was only approved to trade in the OTC Market many months later, in February 2019.

83.     This pattern of trading in advance of a private offering creates the appearance of higher trading volumes and stock liquidity and gives the false impression that there is significant trading interest in the stock. The goal is to attract more investors to participate in the offering based on perceived momentum of the stock. This, paired with false press releases King had Diamond and Gray Reed prepare on behalf of Water Now, as explained in more detail below, created the perfect environment of deception to lure in investors.

84.     John and Melissa King are examples of shareholders that moved their shares during the month preceding the 2018 Offering. Additionally, Colhurst Capital, L.P., an entity owned by Diamond that received a portion of Water Now shares received by HFG pursuant to the Merger, also transferred its shares to a clearing house in 2018. Halter Jr., who received shares from Halter

Family Partnership Limited, originally owned by HFG-CAP, also transferred his shares to Cede & Co. during the same timeframe.

85.     Not only was Diamond part of these suspicious transactions prior to the 2018 Offering, but he and Gray Reed issued Rule 144 Letters to support the removal of resale restrictions from many shareholders' common stocks in the month prior to the 2018 Offering. Rule 144 of the Securities Act of 1933 provides an exemption from registration for an investor's resale of restricted securities. To rely on the safe harbor provided by Rule 144 under the Securities Act, a number of conditions must be met, which must be attested by a legal opinion issued by an attorney, the so-called "Rule 144 Letters." In many cases, Diamond and Gray Reed's Rule 144 Letters lacked proper due diligence, which often led to false representations.

86.     For example, Diamond and Gray Reed's Rule 144 Letters would report that certain shareholders subject to Rule 144 were not affiliates of Water Now, which was false. In fact, on July 17, 2018, Gray Reed issued a Rule 144 Letter to John King, King's brother and Water Now's employee, representing that John King was not an affiliate of Water Now within the three months preceding the Rule 144 Letter request.

87.     Accordingly, Diamond and Gray Reed not only knew or should have known that King was orchestrating multiple strategies to mislead investors to fill his pockets using Water Now securities, but Diamond and Gray Reed participated in the schemes, either actively, such as by not causing Water Now file the proper documents with the SEC and providing Rule 144 Letters in violation of SEC regulations, or passively, by failing to advise Water Now of King's insidious acts involving its stock trade.

**B.** **King Fails to Report and Forfeit Profits from His Short-Swing Trading of His Water Now Stock.**

88.     Under SEA Section 16(b), any profit realized by insiders from the purchase and sale, or sale and purchase, of any equity security of an issuer of registered securities within a period of less than six months must be paid to the issuer. This section applies to a corporation's directors, officers, and beneficial owners of more than 10% of the outstanding shares of any class of publicly traded securities.

89.     According to STC records, on or about October 12, 2016, Water Now issued 18,765,000 shares of common stock to King at $0.50 per share, totaling $9,382,500.00. There are no records of King's payment to Water Now for these shares. Further, King provided no service to Water Now in exchange for $9,382,500.00 of common stock. From October 12, 2016 through April 10, 2017, King transferred or sold 6,522,500 shares of Water Now common stock. Instead of forfeiting the profit from these transfers as required, King kept the profits for himself.

90.     On or about May 1, 2017, Water Now issued another 1,050,500 shares of common stock to King at $0.50 per share, again, with no records of payment or valuable services provided. King then, from May 1, 2017 through October 30, 2017, transferred or sold 1,040,000 of these shares and, unsurprisingly, did not forfeit any profits to Water Now.

91.     Notably, the stock transfers above were not approved in advance by two or more non-employee directors or approved or ratified by a majority of Water Now shareholders as required under the SEA.

92.     Upon information and belief, King realized profits through the above short-swing transactions. It is currently not possible to calculate the exact amount of profits King realized because the underlying transactions have not been publicly reported and/or have not been accurately recorded. For example, King, Diamond, and Gray Reed failed to file SEC Forms 4 in a

timely manner to disclose changes in the amount of Water Now securities King owned. In addition to Water Now's failure to file these forms with the SEC and King's obvious engagement in insider trading, King caused Water Now to violate other federal securities laws by providing false or incomplete information to investors and manipulating the stock market to unfairly benefit himself. Although Diamond and Gray Reed were Water Now's Securities counsel, they also failed to cause the company to file such SEC-required documents, and failed to advise Water Now of the necessity of filing these disclosures or the consequences of failing to do so.

93.     Moreover, Diamond and Gray Reed knew or should have known of King's short-swing trading activity and advised Water Now to pursue recovery of King's trading profits. As such, but for Diamond and Gray Reed's failure to act with reasonable care by providing proper legal advice, Water Now would not have been harmed by King's short-swing trades. In addition, Diamond and Gray Reed should have taken actions to remedy the situation, as prescribed by the Texas Disciplinary Rules of Professional Conduct ("Texas Disciplinary Rules") 1.02 and 1.12. Tex. R. Disc. P. 1.02, 1.12[4].

---

[4] Texas Disciplinary Rule 1.02 provides in relevant part:

(c) A lawyer shall not assist or counsel a client to engage in conduct that the lawyer knows is criminal or fraudulent. A lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel and represent a client in connection with the making of a good faith effort to determine the validity, scope, meaning or application of the law.

(d) When a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in substantial injury to the financial interests or property of another, the lawyer shall promptly make reasonable efforts under the circumstances to dissuade the client from committing the crime or fraud.

(e) When a lawyer has confidential information clearly establishing that the lawyer's client has committed a criminal or fraudulent act in the commission of which the lawyer's services have been used, the lawyer shall make reasonable efforts under the circumstances to persuade the client to take corrective action.

Texas Disciplinary Rule 1.12 provides in relevant part:

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                    **PAGE 30**

### C.    King Makes False Public Statements to Inflate Water Now's Perceived Value with the Assistance of Diamond and Gray Reed.

94.    King advertised Water Now to the general public through numerous press releases, representing that Water Now, including its subsidiary Hydraspin, was entering into contracts for additional business and was destined to become a leader in the water remediation and oil recovery industry. In reality, the statements made in Water Now's press releases and other SEC filings were nothing more than propaganda signed off by King and approved by Diamond and Gray Reed to misrepresent Water Now's performance in order to sell stock, secure investors and lenders, and ultimately collect cash in Water Now's bank accounts to be used for King's own personal gain.

---

(b) A lawyer representing an organization must take reasonable remedial actions whenever the lawyer learns or knows that:

(1) an officer, employee, or other person associated with the organization has committed or intends to commit a violation of a legal obligation to the organization or a violation of law which reasonably might be imputed to the organization;

(2) the violation is likely to result in substantial injury to the organization; and

(3) the violation is related to a matter within the scope of the lawyers representation of the organization.

(c) Except where prior disclosure to persons outside the organization is required by law or other Rules, a lawyer shall first attempt to resolve a violation by taking measures within the organization. In determining the internal procedures, actions or measures that are reasonably necessary in order to comply with paragraphs (a) and (b), a lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyers representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters, and any other relevant considerations. Such procedures, actions and measures may include, but are not limited to, the following:

(1) asking reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

(e) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing or when explanation appears reasonably necessary to avoid misunderstanding on their part.

Many of the touted business opportunities and developments were false, misleading, or contained material misrepresentations and omissions regarding the status of Water Now operations, its financial conditions, and business with other companies. On information and belief, King's propaganda was successful and, to their detriment, Water Now's shareholders, investors, and lenders relied upon the content of the press releases.

95.     On or around August 11, 2017, Water Now filed its Form 10-12G with the SEC. The Form 10-12G for registration of securities, signed by King as Water Now's CEO, reported that Water Now had entered into an agreement with Sun Mark (Gulf) JLT, an affiliate of UK-based Sun Mark Ltd., for the sale of 10,000 units of Water Now's Aqua+ model unit. However, there was more to the agreement with Sun Mark (Gulf) JLT than was disclosed to the public.

96.     Sun Mark Ltd., a United Kingdom manufacturer and distributor of energy drinks, had previously entered into an agreement with Drink Robust, Inc. for the distribution of Sun Mark Ltd.'s product in North America.

97.     This reported agreement between Water Now and Sun Mark (Gulf) JLT was, in fact, just another example of the game of self-dealing that King was playing. King was the CEO, sole director, and sole shareholder of Drink Robust, Inc. until April 26, 2018. King sold his shares to RCI Hospitality Holdings, Inc. and also transferred shares of Water Now common stock to RCI Hospitality Holdings, Inc. as part of the transaction. Water Now's financial consultant, Phil Marshall, also happened to serve as RCI Hospitality's CFO. Kim Vaughn, the administrative officer of Robust Energy, LLC, and shareholder and employee of Water Now, was also known to be Drink Robust, Inc.'s Vice President.

98.     The alleged sale to Sun Mark Ltd., although reported to the SEC in public filings as if Water Now had already entered into the sale agreement, was never consummated, and Water

Now never received any payments from Sun Mark Ltd. Diamond and Gray Reed were aware of these facts, and had even previously assisted King with matters related to Drink Robust, Inc. Nevertheless, Diamond and Gray Reed did not provide the required prudent legal advice, and Water Now did not issue any press releases or file any other documents with the SEC indicating that the sale did not actually occur.

99.     On or about September 26th and November 27th, 2018, Water Now announced a Distribution Agreement with AHT, which touted the purchase of multiple "HydroCyclone" units from Water Now. After this announcement, King began raising money from investors through Revenue Sharing Agreements to fund the purchase of the HydroCyclone units. Diamond and Gray Reed prepared each of the agreements. King never used the funds he raised from these investors to actually pay for the units.

100.    According to Jodi Cramer, Water Now's executive assistant, King said he had "business judgment" to apply the investors' funds as he saw fit (including elaborate holiday parties and quick casino trips north of the Red River) and would "say that in court" if he was ever questioned about it.

101.    Upon information and belief, Diamond and Gray Reed were aware that King had not utilized the funds received from the Revenue Sharing Agreements to purchase the HydroCyclone Units as promised. Specifically, Diamond and Gray Reed knew at least as early as mid-2020, when they prepared a schedule of assets for Water Now which did not include the HydroCyclone Units in connection with a purported asset purchase agreement for all assets of Water Now.

102.    Predictably, Water Now did not issue a subsequent press release indicating it had failed to actually purchase the AHT units, and Diamond and Gray Reed did not advise Water Now to do so.

103.    On or about December 17, 2018, Water Now announced in a press release that it had entered into a two-year agreement with Ross Recovery, Inc. to deploy its oil recovery system at a disposal site in Casper, Wyoming. However, Water Now's internal documents show no records of any substantial operations in Wyoming and no substantial cash flow from these operations.

104.    On information and belief, Diamond and Gray Reed were aware that Water Now was not engaged in substantial operations in Wyoming. Water Now, under King's control and Diamond and Gray Reed's legal guidance, did not issue a corrective statement.

105.    On or about January 22, 2019, Water Now announced Asia Pacific Prime Corporation as the distributor for Water Now's water purification units in the Philippine Islands. No revenue was recognized from that deal.

106.    On information and belief, Diamond and Gray Reed were aware that Water Now was not distributing water purification units through Asia Pacific Prime Corporation. Water Now, under King's control and with Diamond and Gray Reed's legal guidance, did not issue a corrective statement.

107.    On or around February 5, 2019, Water Now announced a new two-year agreement for crude oil recovery at a disposal well site in Guthrie, Oklahoma ("OK Deal"). On March 1, 2019, Water Now leased an apartment in Guthrie where company employees allegedly stayed in connection with the OK Deal. However, there is no indication within Water Now's records dated after April 24, 2019, of any Water Now employees staying in the apartment. There is also no record of ongoing revenue to Water Now from the OK Deal.

108.    On information and belief, Diamond and Gray Reed were aware that Water Now was not engaged in material business operations in Guthrie, Oklahoma. Water Now, under King's control and with Diamond and Gray Reed's legal guidance, did not issue a corrective statement to the public.

109.    On or around March 18, 2019, OTC Markets required Water Now to issue a press release in response to a notification showing that prior promotional reports had caused an increase in the volume of Water Now stock being traded. OTC specifically required Water Now to issue a press release clarifying the connection between Water Now or any company insiders and the promotional reports. OTC Markets also required Water Now's press release to address whether Water Now had ever issued shares or convertible instruments allowing conversion to equity securities at prices constituting a discount to the current market rate at the time of their issuance. Until March 18, 2019, Water Now had executed at least ten convertible notes allowing conversion at substantially discounted market prices.

110.    On information and belief, Diamond and Gray Reed were aware that Water Now had executed at least ten convertible notes allowing conversion at substantially discounted market prices. However, Water Now, under King's direction and with Diamond and Gray Reed's legal guidance, denied any connection with the promotional reports and failed to disclose the convertible notes in its press release in response to OTC Markets' request.

111.    Water Now also sent OTC Markets a non-public statement informing it that sales and purchases of common stock by insiders were subject to approval only by King and Water Now's independent legal counsel. This approval process was Water Now's only compliance procedure concerning proper reporting of insider transaction activity, which allowed King to cause Water Now to unlawfully issue millions of shares to himself and other insiders. King's response to

the OTC Markets, containing these misrepresentations, was approved by Gray Reed and Diamond. This allowed Water Now to continue trading on the OTC Market and King to manipulate Water Now's stock for his own personal benefit.

112.    On or around June 19, 2019, Water Now announced its HydraHeat project. Water Now stated it was "actively pursuing sales and distribution opportunities" and "currently in discussions with a number of big box retailers, HUD and auto accessory and repair businesses." However, on Water Now's 10-K for the fiscal year ended December 31, 2019, the company disclosed that no revenue was generated from HydraHeat units and that Water Now was still "in negotiations with potential third-party manufacturers of the product" and hoped "to finalize an OEM agreement in late Q4 2020 or early Q1 2021," when Water Now would "begin final testing of the retail product offering in hopes of making the product available to the public in the third quarter of 2021." These two statements are not compatible; either Water Now was in negotiations with manufacturers to make the HydraHeat, or it was pursuing sales and distribution opportunities for a product already manufactured. Of course, Water Now never entered into any actual revenue-generating contracts or sales related to the HydraHeat project.

113.    On information and belief, Diamond and Gray Reed knew Water Now had never entered into any actual revenue-generating contracts or sales related to the HydraHeat project. Water Now, under King's direction and with Diamond and Gray Reed's legal counseling, did not issue a corrective statement.

114.    On or around July 9, 2019, Water Now announced a three-year, $3 million agreement with DPIM-ID, LLC to market and distribute Water Now's self-contained mobile purification units in India. Despite its announcement, no revenue was recognized, and no machines were ever shipped to India in connection with this agreement.

115.     On information and belief, Diamond and Gray Reed were aware that Water Now had not actually entered into a legitimate agreement with DPIM-ID, LLC. Water Now, under King's direction and with Diamond and Gray Reed's legal counseling, did not issue a corrective statement.

116.     On or around July 31, 2020, Water Now filed a Form 8-K, drafted and approved by Diamond and Gray Reed, announcing the execution of an Asset Purchase and Sale Agreement ("PSA") with RigMax, whereby RigMax would acquire all assets and rights of Water Now for $30,000,000, notwithstanding Water Now's then-valuation of negative $23,029,000 ("Asset Sale") Notably, Gray Reed received $200,000 in exchange for having its team, including Diamond, prepare the transaction documents, including certain disclosure schedules.

117.     On or around October 5, 2020, Water Now and RigMax entered into an Addendum and Waiver to the Asset Purchase and Sale Agreement, originally disclosed on July 31, 2020, in Water Now's Form 8-K, to acknowledge that RigMax had paid Water Now $625,000 as an advance to the PSA. Both Water Now and RigMax agreed that any advances in payment would be deducted from the total price of the Asset Sale. Further, Water Now agreed that it would refund or apply the advance payments against an equity position in Water Now or Water Now's assets if the PSA was terminated.

118.     RigMax transferred at least $1,606,000 in advances to Water Now through deposits in both Water Now and Hydraspin's bank accounts. Upon information and belief, RigMax advanced a total of $3,000,000 in connection with the Asset Sale; however, this total amount is not reflected in Water Now or Hydraspin's bank accounts. Upon information and belief, the advances were diverted to other bank accounts to which King had access and were used to pay

excessive salaries to Water Now employees, repay loans Water Now allegedly received from KingCo., and cover King's personal expenses.

119.    On November 24, 2020, Water Now sent RigMax a Notice of Termination of Asset Purchase Agreement, whereby Water Now terminated the deal due to RigMax's failure to deliver the purchase price. Despite the termination, Water Now never repaid RigMax for the advancements. RigMax lacks any track record of operations indicating that the Asset Sale was legitimate. Upon information and belief, this Asset Sale was announced for one purpose: to raise Water Now's stock price for King's benefit.

120.    Water Now attached a press release regarding the unilateral termination of the Asset Sale to its Form 8-K filed on November 24, 2020, and included information regarding the same on its Form 10-Q, filed on March 8, 2021. However, Water Now announced to the public that it was merely postponing the special shareholder meeting to approve the Asset Sale, stating that it was still "evaluat[ing] the matter" with RigMax, clearly to lead the public into believing that the Asset Sale was still possible.

121.    On information and belief, Diamond and Gray Reed knew these statements were false because they were directly involved in the transaction and knew that RigMax had terminated the deal. Unsurprisingly, just like all other material misrepresentations that King directed Water Now to disseminate, no public announcements were ever made regarding Water Now's definitive termination of the Asset Sale, and neither Diamond nor Gray Reed advised Water Now to make a corrective statement.

122.    Although the Asset Sale was terminated purportedly due to RigMax's failure to pay, Diamond and Gray Reed, to Water Now and Hydraspin's detriment, failed to pursue any legal remedies for breach of contract. Had Diamond and Gray Reed advised Water Now to seek damages

for RigMax's breach of contract, Water Now would have had the opportunity to pursue its claims and recover damages.

123.    Records show that Diamond and Gray Reed's review of Water Now's press releases was, for the most part, limited to comments concerning writing, such as typos and punctuation. Diamond and Gray Reed performed no relevant due diligence before approving Water Now's press releases, including for filing with the SEC on Forms 8-Ks.

124.    While King caused Water Now to issue all of the above-referenced press releases with the assistance of Diamond and Gray Reed, he was simultaneously raising money, borrowing money, or otherwise obtaining money from others based upon the plethora of optimistic public statements. King then stole this money from the companies and used it for his own purposes and to the detriment of Water Now and Hydraspin.

### D.    King Utilizes Toxic Funding Sources to Raise Additional Cash for His Own Benefit.

125.    From 2018 through 2021, and in complete disregard of his fiduciary duties, King authorized Water Now to enter into multiple Convertible Note Agreements with lenders known to the market for toxic funding practices ("Toxic Lenders"). These Convertible Note Agreements ("Toxic Notes") contained terms allowing the lenders to convert and acquire shares at prices substantially below market price. King's practice of having Water Now issue these Toxic Notes had the potential to trigger sharp selloffs of a borrower's shares and cause substantial shareholder dilution.

126.    Water Now received at least $4,489,000 from Toxic Lenders between 2018 and 2021. These Toxic Lenders included Auctus Fund, LLC, Bellridge Capital, LP, Crown Bridge Partners, LLC, Firstfire Global Opportunities Fund, LLC, GS Capital Partners, LLC, Labrys Fund,

LP, Odyssey Funding LLC, Peak One Opportunity Fund, LP, Power Up Lending Group Ltd., and Tangier Global, LLC.

127.    King also made Water Now enter into similar notes with other investors, such as Robert Sample, Henry Ellis, Rhonda Cree, Robert Bryant, the Bryant Trust, Steve Clohessy, Eric Langan, and others, in exchange for cash, which King and KingCo ultimately collected from Water Now's bank accounts and used for his own personal gain.

128.    As an example of one of the Toxic Notes, Water Now issued a 10% Convertible Redeemable Note to Odyssey Funding, LLC, due on September 10, 2020. This Toxic Note entitled Odyssey Funding to a conversion price equal to 60% of the lowest trading price of Water Now common stock, as reported on the exchange where Water Now's shares were being traded, for fifteen prior trading days, including the day Water Now would receive a notice of conversion.

129.    King was obviously aware of Water Now's financial hardship during the period in which King authorized the Toxic Notes. King knew or should have known that Water Now did not have the resources to pay back all of the Toxic Lenders; in fact, Water Now only repaid $1,695,600 of the $4,489,000 in toxic funding that Water Now received through King's authorization. According to STC's Transaction Journals, instead of paying the Toxic Notes, Water Now issued at least 35,120,838 shares of common stock to its Toxic Lenders. Of those shares, 11,010,855 were transferred at an acquisition price of $0 per share. Conversions by Toxic Lenders represent more than 42% of all shares of common stock issued by Water Now from its inception until August 7, 2020.[5]

130.    Notably, all shares of Water Now that were transferred to the Toxic Lenders were registered with DTC. As previously explained, DTC is a company that provides book-entry and

---

[5] Excluding the 21,390,500 shares of stock issued to King and his family members.

depository services and operates as a settlement system for securities transfers. The transfers to Water Now's Toxic Lenders were also recorded by STC in its stock transfer journal as book entries in DTC's nominee name, "Cede and Co.," which, as explained above, DTC uses to hold and manage securities on behalf of its participants and their customers, such as Water Now's Toxic Lenders.

131.    In addition to Water Now's Toxic Lenders, Kings' friends, family, including John, Joshua, and Melissa King, employees, and business associates transferred approximately 49,125,081 shares of Water Now to DTC. On information and belief, the shares were then traded from DTC electronically on the open market. As only the shareholders' broker dealers have records of subsequent transactions by DTC, Toxic Lenders and insiders affiliated with King could dispose of Water Now shares as they saw fit, including for wrongful purposes such as to manipulate the stock market via "pump-and-dump" and similar schemes.

132.    Ultimately, it is clear that Water Now's financial survival and repayment of the Toxic Notes was of no real concern to King. Rather, King needed cash to continue his nefarious acts: paying his long list of friends and family on Water Now's payroll, maintaining his own personal spending at casinos and expensive restaurants, and siphoning funds from Water Now through "loans" and expense reimbursements.

## E.    King Misappropriates Water Now Funds Raised Through Revenue Sharing Agreements.

133.    As explained above, King utilized a series of misrepresentations to make Water Now appear financially sound and commercially viable to the public. In reality, Water Now had no substantive business operations, and King was using both Water Now and Hydraspin as his own personal ATM. On October 31, 2018, Water Now entered into an Exclusive Sales Distribution Agreement ("Distribution Agreement") with AHT. Pursuant to this Distribution Agreement, Water

Now purchased: i) a Hydraspin hydro cyclone skid; ii) a Skimmer in a quantity to be defined by Water Now in consultation with AHT; iii) a Decant process tank; and iv) eight Hydraspin machines ("HydroCyclone Units"). Water Now further agreed to order a minimum of twelve units of AHT products during the twelve-month period following October 31, 2018, increased by an additional twenty units for each additional twelve-month period during the term of the Distribution Agreement.

134.    According to the Distribution Agreement, Water Now issued AHT 500,000 shares of common stock and committed to issuing another 500,000 shares upon the earlier of either October 31, 2020 or AHT's sale of fifty HydroCyclone Units to Water Now. Despite these terms, Water Now, under King's direction, breached the Distribution Agreement by failing to issue the required second set of 500,000 shares to AHT.

135.    Moreover, as part of the Distribution Agreement, Water Now agreed to pay AHT $300,000 before January 31, 2020, and $500,000 no later than June 30, 2020. Water Now also ordered additional Hydro Cyclone Units, agreeing to pay AHT approximately $2,000,000 for the purchase. Water Now ultimately breached the Distribution Agreement, failing to pay the $800,000 owed to AHT, as well as failing to pay for the additional HydroCyclone Units ordered.

136.    AHT formally terminated the Distribution Agreement in July 2021 as a result of Water Now's breach. In October 2021, AHT sued Water Now, Hydraspin, and King individually for Water Now's breach of contract. Specifically, AHT filed suit for, among other causes of action, breach of contract, negligent misrepresentation, fraud, and conversion, and sought a declaratory judgment to prevent them from using, profiting, or otherwise benefiting from AHT's intellectual property, including AHT's HydroCyclone Units.

137.     Water Now's breach of the Distribution Agreement could have been avoided by King had he either purchased the HydroCyclone Units as promised in the Revenue Sharing Agreements or by simply not entering into the agreement at all. King was fully aware that Water Now otherwise lacked sufficient funds to meet the terms of the Distribution Agreement. Water Now generated $35,570 in net revenue and experienced operating expenses of $1,735,959 in the fiscal year ended December 31, 2017, approximately ten months prior to entering into the Distribution Agreement. Water Now's financial position did not improve in 2018, with net revenue of $168,730 and operating expenses of $4,097,919. Armed with this information, King knew or should have known that Water Now could not satisfy its obligations under the Distribution Agreement if he did not utilize the funds raised from the Revenue Sharing Agreements as intended.

138.     On information and belief, King entered into the Distribution Agreement without the intention of complying with its terms. This is supported by the fact that, from September 2018 through December 2019, Water Now entered into the Toxic Notes discussed above in exchange for $2,649,000. Despite having access to these funds, King caused Water Now to default on the Distribution Agreement—an agreement that would have generated valuable revenue for Water Now.

139.     Further, King used the Distribution Agreement as a basis for Water Now to enter into multiple Revenue Sharing Agreements with investors that enabled Water Now to raise at least $3,616,722.21, which should have been used to purchase at least fourteen HydroCyclone Units. Pursuant to the terms of the Revenue Sharing Agreements, the investors were entitled to part of the revenue generated by the operation of specific HydroCyclone Units. However, Water Now only ordered and received five HyrdroCyclone Units, which it failed to pay for and never

substantially deployed. As a result, no relevant revenue was derived from the purchase and operation of these units.

140.   Diamond and Gray Reed were aware that King had breached the Distribution Agreement, failed to use the funds received from investors according to the terms of the Revenue Sharing Agreements, and only purchased five HyrdroCyclone Units that had not been fully paid. Nevertheless, Gray Reed agreed to represent Water Now, Hydraspin and King simultaneously in the lawsuit brought against them by AHT, despite Diamond and Gray Reed's knowledge of the clear conflict of interests between King and the companies.

141.   According to Water Now's 10-Ks, Water Now only recognized $234,000 in revenue from the execution of the first Revenue Sharing Agreement in the fiscal year ended December 31, 2019. Unsurprisingly, Water Now reported no revenue being generated from the operation of HydroCyclone Units in 2020 and subsequent years.

142.   As a result of King's gross mismanagement, Water Now failed to pay its revenue-sharing investors and, on information and belief, owes between $1,875,000 and $5,625,000 in revenue guaranteed under the Revenue Sharing Agreements.

143.   In 2019, despite Water Now's failure to pay AHT and the Revenue Sharing Agreements investors, King withdrew at least $572,906.37 from Water Now and Hydraspin's bank accounts to repay purported loans that he made to Water Now, including by use of KingCo's bank account. Notably, Water Now's Form 10-K for 2019 reveals that Water Now paid salaries and wages of $2,022,000 that year. However, this is inconsistent with Water Now's own 2019 payroll records, which reflect that $521,417.02 was paid to King, as well as to his friends and family. On information and belief, Water Now, under King's direction, misrepresented its 2019 salaries and

wages in its Form 10-K in order to attract future investors based on Water Now's high salaries when, in reality, the company was struggling to survive.

144.    Water Now's Forms 10-K were reviewed and approved by Diamond and Gray Reed. Pursuant to Diamond and Gray Reed's knowledge due to their role as Water Now's counsel while it was under King's control, Diamond and Gray Reed should have at the very least, conducted thorough due diligence and review of the information to be included in Water Now's SEC filings to avoid misrepresentations. Diamond and Gray Reed's lack of reasonable care contributed to King misleading and taking advantage of Water Now and Hydraspin for King's benefit.

   **F.    King Siphoned Money from Water Now through Loans and Expense Reimbursements.**

145.    Throughout Water Now's existence, substantial sums of money flowed in and out of Water Now and Hydraspin's bank accounts despite a lack of material business operations. These transactions were all conveniently classified as loans from and repayments to King and KingCo.

146.    For example, in 2019, King withdrew at least $559,458.88 from Water Now accounts to repay purported loans he made to the company. However, Water Now's records show King only paid $221,854 to Water Now in 2019.

147.    Based on Water Now's loan ledgers maintained by King, from May 9, 2018, to June 30, 2021, Water Now purportedly borrowed $1,893,263.91 from King and made loan payments to King totaling $1,267,044.49. However, $235,000 of the amount purportedly borrowed by Water Now was not actually received by the company; rather, Water Now's records reflect that it considered $235,000 of "unpaid bonuses" to King as loans. Moreover, bank statements indicate that King only deposited $274,254 into Water Now accounts. King's withdrawals and deposits of his purported loans to Water Now were made using (i) his personal bank account, (ii) KingCo's

bank account, and (iii) large amounts of cash deposits and withdrawals through various bank branches and ATMs.

148.    Additionally, $978,022.74 in deposits were made to Water Now from multiple unidentified sources. For example, on June 23, 2018, an unidentified cash deposit of $100,000 was made into Water Now's JP Morgan Chase Bank account and classified as a loan from King in Water Now's loan ledgers; however, not even Chase was capable of identifying who made that deposit in the bank's corresponding Reconciliation Report. Further, on November 6, 2020, Water Now received a $68,000 deposit from an unidentified source. Adding to the mystery, Water Now's bank statements show no record of the remaining amount in alleged loan deposits from King recorded in Water Now's loan ledgers.

149.    Despite King's fiduciary duties owed to Water Now, King repeatedly paid himself as soon as any substantial funds were deposited or transferred into Water Now's bank accounts instead of paying Water Now's creditors or making investments into Water Now's business operations.

150.    For instance, in July 2019, Water Now had a total of $659,923.60 deposited in its bank account, including $173,685 in disbursements by Toxic Lenders and a $35,000 loan from The Walker 1994 Living Trust. That month, instead of using these deposits for the benefit of Water Now, King paid himself $70,000.

151.    Diamond and Gray Reed knew or should have known of King's use of Water Now and Hydraspin as his own piggy bank through these purported loans to and from Water Now and Hydraspin, as Diamond and Gray Reed were copied on correspondence with Jon Gwynn, Water Now and Hydrapin's accountant, related to King's debt, and further discussed the money King owed to Water Now and Hydraspin in connection with, for example, Water Now's Form 10-Q debt

disclosures. Nevertheless, Diamond and Gray Reed failed to properly advise Water Now regarding the impropriety of King's conduct, admonish King, or withdraw from representing the companies.

152.    King also used a substantial amount of Water Now funds to pay for his personal expenses, including funding his expensive restaurant bills and paying for his gambling habits. For example, on December 16, 2019, King used Water Now's credit card for expenses incurred at WinStar Casino totaling $12,442.50, as well as a $1,460.47 purchase from RCI Dining Services, an adult entertainment business.

153.    King did not use Water Now solely for his own personal advantage but also to pay his family members and friends excessive salaries for which no legitimate services were rendered. In total, according to Water Now's Form 10-Ks, Water Now paid salaries and wages of $1,744,000 in 2018 and $2,022,000 in 2019, despite Water Now's lack of revenue and apparent insolvency.

154.    By way of further example of King's deliberate disregard for the best interests of Water Now, King mandated that Water Now discharge certain unpaid payroll and other liabilities with common stock. According to Water Now's accounting, the company conveyed at least 5,305,000 shares to third parties in exchange for services. However, most conveyances were not supported by service agreements or similar contracts, or actual performance of any services. Although Diamond and Gray Reed were aware of Water Now's stock transactions with no supporting documentation, they failed to demand King's compliance to avoid improper transfers of shares or take any other remedial actions to protect Water Now and Hydraspin's interests. Instead, Diamond and Gray Reed turned their eyes away from such problems, allowing King to continue pursuing his personal interests at the expense of Water Now and Hydraspin.

155.    Worse still, Diamond and Gray Reed surrounded Water Now and Hydraspin with accountants, auditors, broker dealers, share transfer agents, and other professional service

providers that Diamond and Gray Reed knew or should have known to be unethical for the express purpose of taking Water Now public. Those same service providers were now turning a blind eye to King's tortious conduct under the direct supervision of Diamond and Gray Reed.

## V.   KingCo Serves as King's Vehicle to Drain Water Now's Financial Resources.

156.    KingCo played a crucial role in King's depletion of Water Now's assets. King used KingCo's bank accounts to purportedly loan money to, and receive repayments from, Water Now and Hydraspin. Ultimately, King used Water Now and Hydraspin's money for his own personal interests and benefit.

157.    King, at all relevant times, was the CEO, CFO, and Member-Director of Water Now and the CEO, Treasurer, and Member-Director of Hydraspin. As the Managing Member of KingCo, King was equipped with privileged information from Water Now and Hydraspin and was able to use KingCo as an instrument to perpetrate his wrongdoings against both Water Now and Hydraspin. In fact, KingCo not only had knowledge of King's breach of the fiduciary duties he owed Water Now and Hydraspin, but it actively participated in King's siphoning money from them.

158.    According to Water Now's bank statements, from 2019 to 2021, KingCo received at least $551,003.34 from Water Now and transferred $126,300 into Water Now's bank accounts. Likewise, according to Hydraspin's bank statements, KingCo received at least $262,379.62 from Hydraspin while transferring only $13,100.00 to the company.

159.    As stated in more detail above, Water Now was engaged in water purification, and Hydraspin was engaged in oil separation activities. KingCo, however, was created by King to buy, sell, and manage real estate. KingCo had no reason to do business with Water Now or Hydraspin. In fact, neither Water Now nor Hydraspin ever owned real estate and none of the transfers described above were in exchange for value.

160.    Even if KingCo had engaged in legitimate business with Hydraspin and Water Now, the transfers KingCo received from the companies had a suspicious pattern, to say the least. In fact, there are several instances when Water Now made multiple transfers to KingCo within less than 24 hours on successive days of the same month.

161.    For example, as shown below, in January 2021, KingCo received at least seventeen transfers from Water Now's bank accounts, totaling $78,050. On January 6, 2021, Water Now made two transfers to KingCo; one for $3,000 and another for $2,500. On January 11, 2021, Water Now made three more transfers, of $3,000, $1,000, and $750, to KingCo. Then, on January 12, Water Now transferred another $300 to KingCo. The very next day, on January 13, Water Now made two additional transfers of $15,000 and $7,500 to KingCo. Hydraspin's bank statements show a similar pattern of bank transactions.

| Date | Type | Amount |
|---|---|---|
| 1/4/21 | Online Transfer | $1,000.00 |
| 1/6/21 | Online Transfer | $3,000.00 |
| 1/6/21 | Online Transfer | $2,500.00 |
| 1/11/21 | Online Transfer | $3,000.00 |
| 1/11/21 | Online Transfer | $1,000.00 |
| 1/11/21 | Online Transfer | $750.00 |
| 1/12/21 | Online Transfer | $300.00 |
| 1/13/21 | Online Transfer | $15,000.00 |
| 1/13/21 | Online Transfer | $7,500.00 |
| 1/15/21 | Online Transfer | $5,000.00 |
| 1/19/21 | Online Transfer | $8,000.00 |
| 1/20/21 | Online Transfer | $750.00 |
| 1/21/21 | Online Transfer | $500.00 |
| 1/26/21 | Online Transfer | $1,500.00 |
| 1/28/21 | Online Transfer | $750.00 |

| 1/29/21 | Online Transfer | $7,500.00 |
| 1/29/21 | Online Transfer | $20,000.00 |

162.    KingCo jointly and knowingly participated in King's breach of fiduciary duties against Water Now and Hydraspin. Upon information and belief, KingCo functioned as the pipeline through which King used Water Now and Hydraspin to launder money earned from illegal activities. All transfers from Water Now and Hydraspin to KingCo, and ultimately to King for his and KingCo's benefit, were fraudulently executed to the detriment of Water Now and Hydraspin.

## VI.    Diamond and Gray Reed Were Aware of King's Misconduct but failed to protect the interests of the companies.

163.    As separate entities from King, Water Now and Hydraspin were not inherently aware of King's tortious conducted, aided by Diamond and Gray Reed—notably looting Water Now and Hydraspin to the point of insolvency and, ultimately, bankruptcy.

164.    Diamond and Gray Reed promoted the Merger, which was ultimately harmful to Water Now for many reasons. First, Water Now was not remotely well-positioned to go public. Water Now was formed mere weeks before it engaged Gray Reed and began receiving legal advice from Diamond and Gray Reed regarding the Merger and registration of its securities.

165.    Second, Diamond and Gray Reed suffered from severe conflicts of interest, which caused them to place the interests of themselves and HFG-CAP above those of Water Now. Specifically, and by way of example, HFG-CAP was a long-standing client of Gray Reed with deep connections to Gray Reed's partners. HFG-CAP was under court order to facilitate eleven reverse mergers within a specific timeframe, and completing those mergers timely was far more important to Diamond and Gray Reed than the interests of Water Now.

166.     King, Diamond, and Gray Reed surrounded Water Now with a cast of tortious, bad-acting service providers with tainted reputations, a team that would look away while King committed wrongdoings to the detriment of Water Now and Hydraspin, their shareholders, investors, and creditors. For example, Diamond and Gray Reed were intimately familiar with HFG-CAP's modus operandi based on their prior experience with HFG-CAP and how they facilitate taking unsuitable companies public. As another example, STC promoted many unlawful transfers of Water Now common stock upon King, Diamond and Gray Reed's requests and/or approval, including transfers involving company insiders.

167.     Diamond and Gray Reed failed to file many documents with the SEC as required from Water Now by securities rules and regulations, including Form 4s and Regulation D. Furthermore, Diamond and Gray Reed failed to verify the accuracy and completeness of the information provided by King and other insiders before approving the filing of Water Now's Forms 10-K, 10-Q, and press releases. Diamond and Gray Reed also failed to file proper corrective statements or otherwise remedy any misstatements in Water Now's securities documents. Diamond and Gray Reed also issued fraudulent Rule 144 opinion letters that contained misrepresentations allowing for the sale or transfer of restricted shares. Further, Diamond, Gray Reed, and King endorsed King's correspondence to the OTC Markets containing misrepresentations regarding the Toxic Notes.

168.     As Water Now's counsel, Diamond and Gray Reed were aware of King's failure to maintain meaningful operations at Water Now, King's payment of baseless salaries to himself, his family and friends, and of his deceitful market manipulation strategies for the sale of Water Now's stock, short-swing trading, and other nefarious acts that harmed Water Now, Hydraspin, and their shareholders, investors and creditors. This includes, but is not limited to, the purported loans to

and from himself and KingCo and his payment of absurd personal expenses using Water Now and Hydraspin's funds.

169.    Additionally, Diamond and Gray Reed agreed to represent King, Water Now and Hydraspin simultaneously in the lawsuit brought by AHT despite the glaring conflicts of interest between King and the companies, all while knowing that many allegations by AHT were true and caused by King's bad acts towards Water Now and Hydraspin.

170.    By way of additional example, Diamond and Gray Reed also jointly defended King, Water Now and Hydraspin in litigation brought by revenue sharing investors alleging King defrauded them into the Revenue Sharing Agreements when he had no intent to repay the money raised pursuant to the agreement.

171.    Diamond and Gray Reed knew or should have known they could not adequately represent the interests of Water Now and Hydraspin in these lawsuits and simultaneously represent the interests of King—who had been accused of defrauding investors for his own personal benefit.

172.    Diamond and Gray Reed owed Water Now and Hydraspin, as their clients, a duty to protect them from liability in every possible way by using the skill, prudence, and diligence exercised by reasonable attorneys. Further, Diamond and Gray Reed owed Water Now and Hydraspin the duty to advise them of the illegality of their actions, take appropriate action to advise their controlling agents, i.e. King, and to assist in the avoidance of wrongdoings that could seriously harm Water Now and Hydraspin. Diamond and Gray Reed also owed a duty to Water Now and Hydraspin to actively discuss any violative conduct by King or any other party, urge cessation of such conduct, and withdraw from representation if King ignored their warnings and continued his harmful actions. However, their failure to uphold their duties caused harm to Water

Now and Hydraspin, as their legal services contributed to the continuation of King's tortious and harmful conduct.

173.    Diamond and Gray Reed performed little or no investigation to ensure that they were not assisting in King's violations of law pursuant to their duties owed to Water Now and Hydraspin and their obligations as attorneys under Texas Disciplinary Rules 1.02 and 1.12. Instead, Diamond and Gray Reed continued to represent Water Now and Hydraspin and collect attorney's fees while endorsing, aiding, and abetting King's misconduct and tortious acts towards the innocent companies. Water Now and Hydraspin were unaware that they were being used to violate the law and had no way to prevent it other than through the efforts of prudent counsel. Water Now and Hydraspin would not have otherwise engaged in any such conduct directed by King but for Diamond and Gray Reed's failure to provide proper legal services.

174.    Although King was the only person in control of Water Now and Hydraspin, Diamond and Gray Reed had the duty to inform King of his tortious and illegal acts and dissuade him from continuing the same in an effort to best serve the interests of Water Now and Hydraspin. Diamond and Gray Reed could have, for example, advised Water Now through King to implement stronger internal controls or oversight mechanisms, proposed the implementation of whistleblower policies to encourage employees and other parties to report misconduct or concerns confidentially, and/or explored legal avenues to potentially appoint additional directors or establish advisory committees with oversight responsibilities to prevent tortious and illegal acts. Finally, if King refused to follow Diamond and Gray Reed's advice, they had the duty to withdraw from representation. Diamond and Gray Reed failed on all of these fronts, and their failure caused Water Now and Hydraspin harm, insolvency, and ultimately, collapse.

## CAUSES OF ACTION

## COUNT ONE: BREACH OF FIDUCIARY DUTY AGAINST KING

175.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

176.    The fiduciary duties King owed to Water Now are well-settled. As an officer, director, and agent of Water Now, King owed Water Now and its shareholders strict fiduciary duties of good faith, due care, and loyalty. Furthermore, King owed these duties to Water Now's creditors for the period of time in which Water Now was insolvent. Consistently, King owed the same duties to Hydraspin due to his role as Hydraspin's CEO, Treasurer, and sole board member.

177.    King had a duty, by proper diligence, to assure that any statements made to the public regarding Water Now through press releases, SEC filings, or otherwise were accurate and truthful and did not contain any material misstatements of facts or material omissions.

178.    King also had a duty to receive and pay reasonable compensation that was proportional to the services provided and had clear justification. He had a duty to avoid unnecessary spending, transferring stock without proper consideration, and incurring losses and debt due to imprudent funding strategies. King had a duty to operate Water Now and Hydraspin, including making informed and strategic decisions regarding production, distribution, sales, marketing, research and development, and other operational aspects. King unequivocally breached these duties.

179.    King further breached his fiduciary duties in the following non-exclusive ways:

    a.  King misappropriated Water Now funds by failing to forfeit profits from the transfer of his Water Now common stock within less than six months from issuance, including purported gift shares.

b.   King caused Water Now to misrepresent material facts related to its operations, business prospects, and revenue in its press releases.

c.   King abused his position in Water Now and Hydraspin for his own personal gain and to the detriment of both Water Now and Hydraspin and their creditors and/or shareholders and engaged in continuous self-dealing.

d.   King failed to fulfill his fiduciary obligation to manage Water Now and Hydraspin with their best interests in mind.

e.   King caused Water Now to pay excessive salaries without receiving the appropriate value for the same instead of investing capital in the companies and/or repaying loans from third parties.

f.   King committed corporate waste by repaying or allowing himself to be repaid for purported loans to Water Now despite its financial situation, failing to fully repay the money he withdrew and transferred from Water Now and Hydraspin's bank accounts to cover his own unnecessary expenses.

g.   King knowingly exposed and induced Water Now to incur substantial liabilities by causing Water Now to enter into and default on several agreements and failing to comply with federal securities rules and regulations.

h.   King caused substantial dilution and price depreciation to Water Now stock by gifting and transferring his shares to several parties, inducing the conversion of thousands of shares of common stock at significant discounts to market value for the benefit of Toxic Lenders, and causing the issuance of millions of shares to third parties at discounted market prices without any documents supporting several of these transactions.

180.    Given the nature of King's self-dealing pattern towards Water Now and Hydraspin, his insider trading, misrepresentations regarding Water Now's operations, its contracts with third parties, and true financial condition, combined with the depletion of Water Now's corporate assets by incurring more debt, which negatively affected its business valuation, and culminated in Water Now's insolvency and bankruptcy, King's acts and omissions constitute a breach of his duties of loyalty, due care, and good faith.

181.    In breaching his duties of loyalty, good faith, and care, King showed a conscious disregard for the best interests of Water Now and Hydraspin and a lack of good faith.

182.    As a direct and proximate result of King's numerous breaches of his fiduciary duties, Water Now and Hydraspin, their shareholders, and their creditors have sustained substantial, compensable injury for which King is liable.

183.    The damages proximately caused by King's conduct include, but are not limited to, lost profits, expected compensation to Water Now and Hydraspin's investors and/or shareholders, and all funds wrongfully transferred from Water Now for King's benefit. As such, Plaintiff seeks actual damages, such as general or direct compensatory damages, and special or consequential damages, such as lost profits.

184.    Plaintiff further seeks equitable relief in the way of disgorgement of profits received by King through his various breaches of fiduciary duty.

## COUNT TWO: LIABILITY FOR SHORT-SWING INSIDER TRADING AGAINST KING

185.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

186.    King was a director and officer of Water Now and a beneficial owner of more than 10% of Water Now's outstanding shares of common stock.

187.    As described above, on or about October 12, 2016, Water Now issued 18,765,000 shares of common stock to King at $0.50 per share. From October 12, 2016 through April 10, 2017, King transferred or sold 6,522,500 shares of Water Now common stock. On or about May 1, 2017, Water Now issued another 1,050,500 shares of common stock to King at $0.50 per share. King then, from May 1, 2017 through October 30, 2017, transferred or sold 1,040,000 of these shares. On information and belief, these transfers did not involve bona fide gifts.

188.    Despite his status as an insider, King did not forfeit the profits from these transactions to Water Now. Rather, upon information and belief, King kept all profits for his own benefit.

189.    As such, pursuant to SEA Section 16(b), King is liable to Water Now for the profits he realized by engaging in sales of Water Now common stock within six months of the stock's issuance to him.

### COUNT THREE: KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY AGAINST KINGCO

190.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

191.    King breached his fiduciary duties to Water Now and Hydraspin.

192.    Because King managed Water Now and Hydraspin and served as KingCo's Managing Member, KingCo knew that King owed fiduciary duties to both companies and was, therefore, prohibited from, among other things, dissipating their funds for his own personal benefit. Yet, KingCo participated in several cash transactions directed by King that breached King's fiduciary duties to Water Now and Hydraspin. Therefore, KingCo, through King, as its Managing Member, was aware of its participation in King's breach of fiduciary duties.

193.    As a direct and proximate result of KingCo's knowing participation in King's breach of his fiduciary duties, Water Now and Hydraspin, their shareholders, and/or their creditors have sustained substantial, compensable injury for which KingCo is liable.

## COUNT FOUR: ACTUAL FRAUDULENT TRANSFERS AGAINST
## KING AND KINGCO

194.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

195.    In the fiscal year ending 2019, Water Now had assets of $4,415,106, and its liabilities totaled $11 million. By the end of that year, Hydraspin had not even begun purchasing the oil recovery machines it purportedly intended to deploy and had no relevant operations. Additionally, from 2019 to 2021, Water Now owed millions of dollars to investors, lenders, and other third parties. In fact, as previously discussed in more detail, on April 10, 2021, AHT sued Water Now and Hydraspin for failure to pay at least $2 million under their Distribution Agreement.

196.    Despite the clearly poor financial performance of Water Now and Hydraspin, KingCo received at least $551,003.34 in transfers from Water Now and $262,379.62 in transfers from Hydraspin from 2019 to 2021.

197.    The transfers made under King's direction by Water Now and Hydraspin to KingCo had the actual intent to hinder, delay, or defraud Water Now and Hydraspin's then-current and future creditors insofar as the transfers were illegal and part of King's scheme to siphon the companies' funds for his personal benefit.

198.    Actual intent is evidenced by King and KingCo's status as insiders in relation to Water Now and Hydraspin due to King's control over both companies in addition to KingCo. KingCo's relationship with Water Now and Hydraspin was sufficiently close for KingCo's actions

to deserve closer scrutiny as compared to the scrutiny of those dealing at arms-length with Water Now and Hydraspin.

199.    Actual intent is further evidenced by the nature of the transfers themselves. The transfers from Hydraspin and Water Now to KingCo, made under King's direction, siphoned a substantial amount of cash from Hydraspin and Water Now. Further, Water Now's then insolvency and King's pattern of incurring debt on behalf of Water Now, ignoring its clear inability to pay, is additional evidence of King and KingCo's actual intent.

200.    Accordingly, Plaintiff, as trustee for Water Now and Hydraspin's estate, representing their creditors as authorized by § 544(b)(1) of the Bankruptcy Code and § 24.005(a)(1) of the Texas Uniform Fraudulent Transfer Act ("TUFTA"), seeks to recover the full value of all monetary transfers made by Water Now and Hydraspin to King and KingCo. Plaintiff seeks to recover the full value of such transfers from King and KingCo, as well as all subsequent transferees who took any portion of the funds while not acting in good faith. 11 U.S.C.A. § 544(b)(1); Tex. Bus. & Com. Code § 24.005(a)(1).

### COUNT FIVE: CONSTRUCTIVE FRAUDULENT TRANSFERS AGAINST KING AND KINGCO

201.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

202.    Neither Water Now nor Hydraspin received reasonably equivalent value in exchange for effectuating the transfers made by both companies to KingCo. To the extent any transfers to King were supposedly for payment of wages, King's services provided, in theory, to Water Now and Hydraspin were ultimately for his own benefit and the companies received nothing but losses in exchange for any such payments. In fact, the transfers, made under King's direction

and for his own benefit, resulted in the companies being greatly damaged by the depletion of their assets.

203.    As stated above, Water Now's total assets were $4,415,106, and its liabilities totaled $11 million in the fiscal year ended December 31, 2019. Hydraspin was not even operating that year. Clearly, at the time of the transfers, Water Now and Hydraspin were generally not paying their debts as they became due and were financially vulnerable. Further, the claims by Water Now and Hydraspin's estate creditors ratify their insolvency when the transfers occurred.

204.    As authorized by § 544(b)(1) and § 24.005(a)(2) of the TUFTA, Plaintiff seeks to recover the full value of all monetary transfers made by Water Now and Hydraspin to King and KingCo. Plaintiff seeks to recover the full value of such transfers from King and KingCo, as well as all subsequent transferees who took any portion of the funds while not acting in good faith. 11 U.S.C.A. § 544(b)(2); Tex. Bus. & Com. Code § 24.005(a)(1).

## COUNT SIX: NEGLIGENCE/GROSS NEGLIGENCE AGAINST DIAMOND AND GRAY REED

205.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

206.    Diamond and Gray Reed owed a duty to Water Now and Hydraspin, their clients, to discharge their professional responsibilities through the exercise of the degree of care, skill, and competence that attorneys of reasonable skill and competence would have exercised under similar circumstances.

207.    Diamond and Gray Reed's negligent acts or omissions breached their duty to Water Now and Hydraspin in many ways that culminated in the complete depletion of Water Now and Hydraspin's resources to the point of insolvency, negative business valuation, and, finally, bankruptcy. For instance, Diamond and Gray Reed surrounded Water Now by service providers

with unethical business practices, enabling King to breach his fiduciary duties to Water Now and Hydraspin and harm them, their shareholders, investors, and creditors. Diamond and Gray Reed failed to advise Water Now and Hydraspin of improper stock transfers and failed to cause compliance with many SEC filing requirements. In fact, Diamond and Gray Reed failed to conduct proper due diligence to verify information provided by King to be included in public filings, resulting in SEC filings encompassing false content.

208.    Diamond and Gray Reed's negligence and/or gross negligence proximately caused injury and substantial damages to Water Now and Hydraspin and their business' valuation, their shareholders, investors, and creditors, ultimately causing Water Now and Hydraspin's bankruptcy. But for Diamond and Gray Reed's acts and omissions, the scale and duration of King's nefarious scheme to personally benefit from Water Now and Hydraspin and its resulting harm to the companies and their shareholders, investors and creditors would have been reduced or eliminated. Defendants' conduct constitutes gross negligence as that term is defined in Tex. Civ. P. & Rem Code § 41.001. Accordingly, Plaintiff is entitled to recover exemplary damages.

### COUNT SEVEN: BREACH OF FIDUCIARY DUTIES AGAINST DIAMOND AND GRAY REED

209.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

210.    As Water Now and Hydraspin's corporate counsels, Diamond and Gray Reed owed fiduciary duties to the companies. Those duties included, but were not limited to, the duties of care and loyalty, the duty to act in good faith, perfect candor, openness and honesty, the duty to act without concealment and deception, and the duty to act in the best interests of Water Now and Hydraspin and not their own.

211.    Diamond and Gray Reed were also required to subordinate their interests to those of Water Now and Hydraspin and refrain from making misrepresentations to them, from self-dealing, and from engaging in conflicts of interest when giving legal advice to Water Now and Hydraspin or when representing the companies.

212.    Diamond and Gray Reed failed to inform Water Now and Hydraspin of numerous conflicts of interests, including involving Diamond, Gray Reed, and the Halter family and businesses, and related to the conflicting representation of Water Now, Hydraspin and King in the lawsuits filed against them by AHT and others. While such conflicts existed, Diamond and Gray Reed failed to withdraw representation and continued providing advice to Water Now and Hydraspin when certain conflicts of interest likely would have or did impair Diamond and Gray Reed's judgment, thereby putting their interests ahead of those of Water Now and Hydraspin. Accordingly, Diamond and Gray Reed breached the duties they owed to the companies as their clients, including the duty of loyalty.

213.    As a direct and proximate result of Diamond and Gray Reed's breach of fiduciary duties, Water Now and Hydraspin, have sustained substantial, compensable injury for which Diamond and Gray Reed are liable.

214.    Diamond and Gray Reed's violations were clear and serious; therefore, Plaintiff is entitled to forfeiture of the legal fees Diamond and Gray Reed received from Water Now and Hydraspin. Finally, the conduct of Diamond and Gray Reed was also intentional, willful, and malicious, thereby warranting an award of exemplary damages.

## COUNT EIGHT: KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY AGAINST DIAMOND AND GRAY REED

215.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

216.    King breached the fiduciary duties he owed to Water Now and Hydraspin.

217.    Diamond and Gray Reed knowingly participated in these breaches of fiduciary duties. Diamond and Gray Reed, as corporate counsel to Water Now and Hydraspin, knew King owed fiduciary duties to Water Now and Hydraspin. Diamond and Gray Reed were also aware of King's tortious acts that were harming their clients Water Now and Hydraspin. Accordingly, Diamond and Gray Reed were aware that King was breaching his fiduciary duties.

218.    As a direct and proximate result of Diamond and Gray Reed's knowing participation in King's breach of his fiduciary duties, Water Now and Hydraspin, their shareholders, and their creditors have sustained substantial, compensable injury for which Diamond and Gray Reed are liable.

## COUNT NINE: ACTUAL FRAUDULENT TRANSFERS AGAINST GRAY REED

219.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

220.    As stated above, throughout 2019, Water Now had $4,415,106 in total assets, while its liabilities totaled $11 million. By the end of that year, Hydraspin had not begun manufacturing the oil recovery machines it purportedly intended to sell and had no relevant operations. Moreover, from 2019 to 2021, Water Now owed millions of dollars to investors, lenders, and other third parties, including $2 million to AHT.

221.    Despite the clearly poor financial performance of Water Now and Hydraspin, Gray Reed received at least $321,966.20 in transfers from Water Now and $15,000 in transfers from Hydraspin from 2019 to 2021.

222.    The transfers made under King's direction by Water Now and Hydraspin to Gray Reed had the actual intent to hinder, delay, or defraud Water Now and Hydraspin's then-current

and future creditors insofar as the transfers were illegal to the extent they were part of Diamond and Gray Reed's efforts to assist King in his nefarious endeavors against Water Now and Hydraspin for his personal benefit.

223.   Actual intent is evidenced by Gray Reed's status as insiders, due to their role as legal counsel in relation to Water Now and Hydraspin. Gray Reed's relationship with Water Now and Hydraspin was sufficiently close for Gray Reed's actions to deserve closer scrutiny as compared to the scrutiny of those dealing at arms-length with Water Now and Hydraspin.

224.   Actual intent is further evidenced by the nature of the transfers themselves. The transfers from Hydraspin and Water Now to Gray Reed were made under King's direction to purportedly pay for Gray Reed's legal fees when Diamond and Gray Reed were, in fact, incurring such fees to assist King in his misconduct towards Hydraspin and Water Now. Further, Water Now's then insolvency is additional evidence of King and Gray Reed's actual intent.

225.   Accordingly, Plaintiff, as trustee for Water Now and Hydraspin's estate, representing their creditors as authorized by § 544(b)(1) of the Bankruptcy Code and § 24.005(a)(1) of the TUFTA, seeks to recover the full value of all monetary transfers made by Water Now and Hydraspin to Gray Reed. Plaintiff seeks to recover the full value of such transfers from Gray Reed, as well as all subsequent transferees who took any portion of the funds while not acting in good faith. 11 U.S.C.A. § 544(b)(1); Tex. Bus. & Com. Code § 24.005(a)(1).

### COUNT TEN: CONSTRUCTIVE FRAUDULENT TRANSFERS OR, IN THE ALTERNATIVE, UNJUST ENRICHMENT AGAINST GRAY REED

226.   Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

227.   Neither Water Now nor Hydraspin received reasonably equivalent value in exchange for effectuating the transfers made by both companies to Gray Reed to the extent that

the legal services purportedly provided facilitated King's misconducts and resulted in Water Now and Hydraspin's ruin.

228.    As previously stated, Water Now's total assets were of $4,415,106, and its liabilities totaled $11 million in 2019. Hydraspin was not operating that year. Accordingly, at the time of the transfers, Water Now and Hydraspin were generally not paying their debts as they became due and were financially vulnerable. Furthermore, the claims by Water Now and Hydraspin's estate creditors ratify their insolvency when the transfers occurred.

229.    As authorized by § 544(b)(1) and § 24.005(a)(2) of the TUFTA, Plaintiff seeks to recover the full value of all monetary transfers made by Water Now and Hydraspin to Gray Reed. Plaintiff seeks to recover the full value of such transfers from Gray Reed, as well as all subsequent transferees who took any portion of the funds while not acting in good faith. 11 U.S.C.A. § 544(b)(2); Tex. Bus. & Com. Code § 24.005(a)(1).

230.    In the alternative, Plaintiff is entitled, in equity, to disgorgement of the transfers to Gray Reed pursuant to the doctrine of unjust enrichment under applicable law. Diamond and Gray Reed received funds by taking undue advantage of Water Now and Hydraspin, insofar as the transfers were supposed payment of legal fees concerning assistance that Gray Reed provided to King in performing his wrongdoings against Water Now and Hydraspin. Water Now and Hydraspin made these payments without knowledge of the facts involving King, Diamond, and Gray Reed's illegal acts.

## DAMAGES AND ATTORNEYS' FEES

231.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

232.    Defendants' conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of Water Now and Hydraspin, their shareholders, investors, and/or creditors, all of whom were exposed to such conduct and were damaged by the same. As such, Defendants actions constitute gross negligence, and this gross negligence caused Water Now and Hydraspin, their shareholders, investors, and/or creditors to suffer damages.

233.    Defendants' grossly negligent conduct described above is so egregious that it demands the imposition of an award of exemplary damages pursuant to applicable law. Tex. Civ. Prac. & Rem. Code § 41.003, et seq. Similarly, Diamond and Gray Reed knew or should have known that their participation in King's breaches of fiduciary duties would result in extraordinary harm to Water Now and Hydraspin. Accordingly, Plaintiff is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

234.    Plaintiff further seeks exemplary damages against King, KingCo, and Gray Reed as a result of their fraudulent acts in relation to the monetary transfers outlined in this Complaint. *Id*. at (a)(1).

235.    Additionally, Plaintiff hereby demands an award for all of Plaintiff's reasonable attorneys' fees incurred in bringing this action against the Defendants, whether based upon an applicable contract or applicable statute, including but not limited to those allowed under the Texas Uniform Fraudulent Transfers Act. Tex. Bus. & Com. Code §24.013.

## **JURY DEMAND**

236.    Plaintiff hereby demands a trial by jury on all causes of action.

**PRAYER FOR RELIEF**

Accordingly, Plaintiff prays the Court enter judgment awarding it the following relief:

a.      Actual damages;

b.      Consequential damages;

c.      Compensatory and/or special damages;

d.      Equitable relief;

e.      Disgorgement;

f.      Exemplary damages;

g.      Reasonable and necessary attorneys' fees;

h.      All costs of court and pre-judgment and post-judgment interest at the highest rate permitted by law; and

i.      All other relief to which Plaintiff is entitled.

July 15, 2024                          Respectfully submitted,

                                       **CHAMPION LLP**

                                       */s/Austin Champion*

                                       Austin Champion
                                       Texas Bar No. 24065030
                                       Austin.Champion@championllp.com

                                       Andrew D. Gray
                                       Texas Bar No. 24110756
                                       Andrew.Gray@championllp.com

                                       Thaís Amaral Dourado
                                       Texas Bar No. 24136704
                                       Thais.Dourado@championllp.com
                                       ----

                                       2200 Ross Avenue, Suite 4500W
                                       Dallas, Texas 75201
                                       214-225-8880 | Main
                                       214-225-8881 | Fax

                                       **COUNSEL FOR PLAINTIFF**


                    <u>**CERTIFICATE OF SERVICE**</u>

     The undersigned certifies that a true and correct copy of the foregoing document was served
via the Court's CM/ECF Court Filing System on all counsel of record on July 15, 2024.

                                       */s/ Austin Champion*
                                       Austin Champion